**Gary A. PODELL, Plaintiff,**

v.

**CITICORP DINERS CLUB, INC., Citicorp Credit Services, Inc., Nissan Motor Acceptance Corporation, Salon Furniture Co., TRW, Inc., Trans Union Corporation, and Equifadx, Inc., Defendant.**

No. 94 Civ. 0813 (CSH).

United States District Court,
S.D. New York.

Feb. 5, 1996.

---

Gabriel J. Fischbarg, New York City, for Plaintiff.

Jones, Day, Reavis & Pogue, New York City (Heidi A. Wendel, of counsel), for Defendant TRW, Inc.

Marion, Satzberg, Trichon & Kogan, P.C., Philadelphia, PA (Bruce S. Luckman, of counsel), for Defendant Trans Union Corporation.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge:

Plaintiff Gary A. Podell brought this action against defendants Citicorp Diners Club, Inc. ("Diners Club"), Citicorp Credit Services, Inc. ("Credit Services"), Nissan Motor Acceptance Corporation ("Nissan"), Salon Furniture Co. ("Salon"), TRW, Inc. ("TRW"), Trans Union Corporation ("Trans Union"), and Equifax, Inc. ("Equifax"), seeking damages under the Fair Credit Reporting Act ("FCRA") 15 U.S.C. § 1681 *et. seq.*, and additionally under state statutory and common law.

Plaintiff filed his complaint on February 8, 1994. Diners Club and Credit Services moved to dismiss the complaint as to them. The Court granted that motion in an opinion dated July 26, 1994, reported at 859 F.Supp. 701. Thereafter plaintiff agreed to dismissal of the action against Nissan and Equifax. Plaintiff has never served Salon with the complaint.

Plaintiff then filed a first amended complaint dated December 5, 1994. Notwithstanding the events just recited, plaintiff continues to list all the original parties defendant in the caption. It is apparent, however, that plaintiff's only surviving claims are against TRW and Trans Union.

Following extensive discovery, TRW and Trans Union now move for summary judgment under Rule 56, Fed.R.Civ.P.

## Background

TRW and Trans Union are credit reporting agencies. Subscribing companies report to such agencies both the credit information they obtain when they grant credit to a consumer and the payment history of the consumer. Credit reporting agencies then compile a credit report on the consumer to distribute to other subscribers from whom the consumer has requested credit.

The plaintiff's amended complaint alleges that on or about June 27, 1991, he became aware that an unknown third party or parties had obtained credit from Diners Club, Salon and Nissan in plaintiff's name without his knowledge or authorization. This resulted in debts accruing against plaintiff which were not paid. At the same time, plaintiff learned that Diners Club, Nissan and Salon had reported to TRW that plaintiff failed to pay debts he owed to them.

Plaintiff further alleges that in April 1992, he learned that Diners Club and Salon had reported to Trans Union that plaintiff had failed to pay debts owed to them.

Plaintiff contends that these debts were incurred by others without his consent, so that the reports of his indebtedness were inaccurate.

Plaintiff complains of the actions taken by TRW and Trans Union after he notified those agencies of the circumstances. It will be useful to consider the evidence revealed by the record with respect to each credit reporting agency separately.

## TRW

In late June 1991, plaintiff obtained a copy of a TRW credit report on him dated June 27, 1991. Plaintiff noted a number of references to entities with whom he had not conducted business. Plaintiff wrote a letter dated July 2, 1991 to TRW's office in Parsipanny, New Jersey, advising TRW of those circumstances and asking that the items in question be cleared up as quickly as possible, since "I am an applicant to the Connecticut Bar and they will require a clean TRW."

While plaintiff's June 27, 1991 credit report contained a number of disputed items, plaintiff confines his complaint with respect

to TRW to the delinquent account reported by Salon.[1] Accordingly I will confine this discussion to that account.

Plaintiff complains of TRW's failure to remove inaccurate debts from his credit history from June 1991 to March 1994. He further complains that TRW reported these inaccurate debts to Daily Reporting Service, a company to which inquiries about an individual's credit rating may be directed.

According to the affidavit of Carolyn S. Helm, a Consumer Affairs Special Services Specialist in TRW's information systems and services division, located in Allen, Texas, that office of TRW received plaintiff's July 2, 1991 letter on July 11. In preparing her affidavit, sworn to on March 8, 1995, Helm reviewed the pertinent documents still existing in the TRW's files. Helm states that on July 11, 1991, the day her division received plaintiff's letter, TRW "reinvestigated the [Salon] accounts by sending a CDV to Salon Furniture indicating that plaintiff disputed the accounts as not belonging to him." Affidavit ¶ 10.

A "CDV" is a Consumer Dispute Verification form. TRW sends that form to subscribers who have reported disputed accounts. The CDV asks subscribers to check whether the information they have about a consumer matches the information on TRW's credit report. If a subscriber fails to respond to a CDV or indicates that TRW's account information is incorrect, TRW deletes the disputed information.[2]

It is TRW's practice to send to a consumer such as plaintiff an updated credit report upon the completion of the reinvestigation process. Consumers are also advised of their rights to have corrected credit reports sent to third parties who received reports on the consumer before recent changes were made.

Where the reinvestigation does not resolve the dispute, TRW's practice is to notify the consumer of his right to submit a statement setting forth the nature of the dispute.

TRW includes the consumer's statement in the consumer's credit report, so that it will come to the attention of all persons authorized to obtain a particular consumer's report. Helm affidavit at ¶ 5.

In the case at bar, Helm's affidavit recites that TRW received the CDV back from Salon stating that the accounts were correctly reported as belonging to plaintiff. On July 25, 1991, a note was placed in plaintiff's credit file that the Salon accounts should continue to be reported as plaintiff's, based on the response received from Salon. On August 13, 1991, according to Helm's affidavit at ¶ 10, confirmation of the investigation results was mailed to plaintiff.

That confirmation form contained the following notice:

*STATEMENT OF DISPUTE*—If our checking has not resolved your dispute, or you continue to dispute the accuracy of the item, you may file a brief statement explaining why the information is not accurate. We will note the item is disputed and include your statement or summary of it on your file. *At your request, we will send a copy of the report reflecting the results of our checking and your statement (or summary) to any credit grantor or employer shown as an inquiry.*

If the information on your report is accurate, but you feel that an explanation of the circumstances as to why you could not or did not pay is necessary, you should directly inform the credit grantor of the explanation when applying for credit. An explanation of the circumstances is *not* considered a statement of dispute and will *not* be added to your report.

The confirmation form that TRW's records indicate was mailed to plaintiff contained a notation that Salon had reported back to TRW that the account was correctly reported as belonging to plaintiff and that TRW would not update the account information.

---

1. The first amended complaint alleges at ¶ 10 that plaintiff's July 3, 1991 letter referred to indebtedness to Diners Club and Nissan, as well as Salon. However, plaintiff's allegations of TRW's fault, in ¶ 11, refer only to TRW's failure to remove the inaccurate reference to Salon. While plaintiff's brief in opposition refers at p. 3 to other accounts, the complaint frames and limits the issues.

2. Helm affidavit at ¶ 4. *See also Stevenson v. TRW, Inc.*, 987 F.2d 288, 291 (5th Cir.1993).

According to TRW's records, TRW did not receive a request from plaintiff to include a consumer statement on his credit file. Plaintiff does not contend that he forwarded such a request to TRW. However, plaintiff contends in opposing the present motion that he never received the confirmation form and its notice of his right to proceed in that fashion.

According to TRW's records, its next communication from plaintiff with respect to the Salon account took the form of the complaint in this action, which plaintiff filed on February 8, 1994. A copy of the complaint came into Helm's hands. She accessed a TRW credit report about plaintiff, dated March 11, 1994, which showed an indebtedness by plaintiff to Salon since July 1991. Helm tried to verify the account by telephone with Salon. Salon refused to verify the account by telephone or fax. Helm sent a CDV form to Salon by mail on March 21, 1994, indicating that plaintiff disputed the account. On March 22, 1994 Helm removed the Salon account from plaintiff's credit report, pending Salon's return of the CDV form. On April 1, 1994, TRW received the form from Salon with the notation that the account was "not on system." Helm affidavit at ¶ 12. TRW has not included the Salon account on plaintiff's credit report since it was deleted on March 22, 1994.

Although TRW retains such records indefinitely, it has no record of receiving a fax from Salon at any time, informing TRW that the Salon accounts should no longer be listed on plaintiff's credit report. Helm affidavit at ¶ 13. TRW's counsel advised plaintiff's counsel in a letter dated April 11, 1994 that the Salon account was investigated and removed from plaintiff's credit report on March 22, 1994. Counsel enclosed a copy of plaintiff's credit report dated April 7, 1994 on which no derogatory items appeared. Affidavit of Heidi Wendel, Esq., verified in March 1995 and Ex.H.

*Trans Union*

Plaintiff's amended complaint alleges that in April 1992, plaintiff became aware that Diners Club and Salon had reported to Trans Union that plaintiff failed to pay debts owed to them. Plaintiff further alleges that in April 1991, he notified Diners Club and Salon

that he was not the individual who accumulated the debts in question. Plaintiff further alleges that on or about "April, 1992," Diners Club notified Trans Union to remove the reports from plaintiff's credit history that plaintiff failed to pay a debt to it and that Diners Club had instituted litigation against plaintiff. That particular allegation is made "upon information and belief." Amended Complaint ¶ 15. Plaintiff further alleges that "on or about April 18, 1992," Salon notified Trans Union to remove the report from plaintiff's credit history that plaintiff failed to pay a debt to Salon. That allegation is also made "upon information and belief." *Id.* at ¶ 16.

Plaintiff complains of Trans Union's failure to remove these inaccurate reports from his credit history statement during the period from April 1992 though March 1994. Plaintiff also complains that Trans Union reported these inaccurate debts to Daily Reporting Services.

On April 18, 1992, plaintiff went to the Salon Warehouse in Hoboken, New Jersey. According to plaintiff's deposition testimony he met there with an individual named Valez, who acknowledged that plaintiff was not the purchaser of the items in question. Plaintiff testified that in his presence Valez prepared a two-page fax transmission and sent it as plaintiff watched. Valez gave plaintiff a copy of the fax. It consists of two pages. The first page, bearing a Salon caption, indicated that the fax was being transmitted to Trans Union. It contained instructions to delete a fraud account. The second page of the fax was a form filled out by Salon listing the accounts and plaintiff's name. It contained the notation: "This is a fraud account. Should have never been reported—please delete."

Plaintiff formed the impression, based upon what Valez told him, that this communication would clear his account with all credit reporting agencies. There is no evidence, however, that Salon communicated with anyone other than Trans Union.

Subsequently plaintiff learned that Trans Union was continuing to include in plaintiff's credit report a reference to the Salon debt as

well as debts to Nissan and Diners Club. Plaintiff wrote a letter to Trans Union's office in Springfield, Pennsylvania, dated December 3, 1993, advising that these entries were inaccurate and demanding that they be deleted.

Trans Union's consumer relations manager, Eileen Little, testified by deposition that plaintiff's protest letter dated December 3, 1993 worked its way to her department on January 10, 1994. Having reviewed Trans Union's records, Little testified that when she received plaintiff's complaint, the Nissan debt was no longer listed on the his credit report. CDVs were sent to Diners Club and Salon. On the basis of Diners Club's response, Trans Union deleted that item from plaintiff's credit report. Salon made no response, and Trans Union deleted that item for that reason. Trans Union sent plaintiff a corrected copy of his credit report in February 1994, with all disputed items having been deleted.

After plaintiff filed this suit on February 8, 1994, Little was shown a copy of the apparent April 18, 1992 fax from Salon to Trans Union. She testified that at that time, there was no need to go back to reinvestigate the Salon account. There were two reasons. First, the Salon account was no longer being carried on plaintiff's credit report. Secondly, Trans Union's files reflected that as of December of 1993, Salon was still reporting the account as a debt of plaintiff's. Little testified: "So even if they [Salon] sent us that letter in 4 of '92, they continued to send an update through their tape dated 12 of '93 carrying that same information." Little Deposition at 4. In point of fact, a credit report for plaintiff generated by Trans Union on January 27, 1994 showed that in January 1994, Salon had advised Trans Union that plaintiff was still indebted to it. Little Deposition Ex. 2–v.

Plaintiff alleges eight causes of action against both TRW and Trans Union. The first two causes of action arise under the FCRA. The first cause of action charges negligence under 15 U.S.C. § 1681o. The second cause of action charges willful noncompliance with the FCRA under 15 U.S.C. § 1681n.

The remaining causes of action allege state and common law claims. The third cause of action alleges violation of § 349 of the New York General Business Law; the fourth cause of action alleges negligent infliction of emotional distress; the fifth cause of action alleges intentional infliction of emotional distress; the sixth cause of action alleges defamation; the seventh cause of action alleges prima facie tort; and the eighth cause of action alleges negligence.

The damages plaintiff allegedly suffered are described in ¶¶ 18 and 19 of the amended complaint. They allege that plaintiff was prevented or rejected from making purchases, and "could not attempt" to make purchases of goods and services, including an apartment and a car; that plaintiff was prevented or rejected from renting an apartment, entering business deals, getting credit cards, consolidating credit cards and increasing his credit card limits, and that he experienced further unspecified hardships "as if he had been placed on a *de facto* involuntary bankruptcy." In addition, plaintiff alleges that he suffered extreme humiliation, injury to his reputation, emotional distress, mental anguish, migraine headaches and long periods of sleeplessness and nervousness.

Following discovery by deposition and production of documents, TRW and Trans Union move for summary judgment.

### Discussion

■ Under Fed.R.Civ.P. 56(c), the moving party is entitled to summary judgment if the papers "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." On such a motion, "a court's responsibility is to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir.1991) (citing *Knight v. U.S. Fire Insurance*, 804 F.2d 9 (2d Cir. 1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987)) (citation omitted). The responding party "must set forth specific facts showing that there is a genuine

issue for trial." Fed.R.Civ.P. 56(e). "The non-movant cannot 'escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts,' . . . or defeat the motion through 'mere speculation or conjecture.'" *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990) (citations omitted). While the party resisting summary judgment must show a dispute of fact, it must also be a material fact in light of the substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The FCRA provides the governing law with respect to plaintiff's first two causes of action.

Congress enacted the FCRA in 1970. The statutory purpose is recited in 15 U.S.C. § 1681(b):

> It is the purpose of this subchapter to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter.

Consistent with that congressional purpose, 15 U.S.C. § 1681(b) provides:

> Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

Consumers have the right to see their credit information and to dispute the accuracy of their credit reports. 15 U.S.C. §§ 1681g, 1681h. The statutory procedure in case of disputed accuracy is set forth in 15 U.S.C. § 1681i. § 1681i(a) provides:

> If the completeness of accuracy of any item of information contained in his file is disputed by a consumer, and such dispute

is directly conveyed to the consumer reporting agency by the consumer, the consumer reporting agency shall within a reasonable period of time reinvestigate and record the current status of that information unless it has reasonable grounds to believe that the dispute by the consumer is frivolous or irrelevant. If after such reinvestigation such information is found to be inaccurate or can no longer be verified, the consumer reporting agency shall promptly delete such information. The presence of contradictory information in the consumer's file does not in and of itself constitute reasonable grounds for believing the dispute is frivolous or irrelevant.

If the credit reporting agency's reinvestigation does not resolve the dispute, "the consumer may file with the agency 'a brief statement setting forth the nature of the dispute.'" § 1681i(b). Unless there is reasonable grounds to believe that the consumer's statement of a dispute "is frivolous or irrelevant," the consumer reporting agency is required in any subsequent consumer report containing the information in question to "clearly note that it is disputed by the consumer and provide either the consumer's statement or a clear and accurate codification or summary thereof." § 1681i(c).

15 U.S.C. § 1681i(d) provides:

> Following any deletion of information which is found to be inaccurate or whose accuracy can no longer be verified or any notation as to disputed information, the consumer reporting agency shall, at the request of the consumer, furnish notification that the item has been deleted or the statement, codification or summary pursuant to subsection (b) or (c) of this section to any person specifically designated by the consumer who has within two years prior thereto received a consumer report for employment purposes, or within six months prior thereto received a consumer report for any other purpose, which contained the deleted or disputed information. The consumer reporting agency shall clearly and conspicuously disclose to the consumer his rights to make such a request. Such disclosure shall be made at or prior to the time the information is deleted

or the consumer's statement regarding the disputed information received.

■ Under the statutory scheme, a credit reporting agency is not strictly liable for inaccuracies in a credit report. Even if a report contains inaccuracies, the agency will escape liability if it establishes that the report was generated by following reasonable procedures. *Cahlin v. General Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir.1991); *Thompson v. San Antonio Retail Merchant's Association*, 682 F.2d 509, 513 (5th Cir.1982); *Hauser v. Equifax, Inc.*, 602 F.2d 811, 814–15 (8th Cir.1979). Stated otherwise, the statute imposes upon a credit reporting agency a "duty of reasonable care in preparation of [a] report," a duty that extends to updating procedures. *Thompson*, 682 F.2d at 513.

■ With respect to investigating and deleting inaccurate information, §§ 1681i(a) give agencies a "reasonable time" to reinvestigate a dispute, a concept which depends upon the particular circumstances of the dispute. *Stevenson v. TRW, Inc.*, 987 F.2d at 292. The consumer plaintiff bears the burden of proving that a credit reporting agency acted negligently. A variety of acts or omissions may be regarded as negligent. For example, "[a]llowing inaccurate information back onto a credit report after deleting it because it is inaccurate is negligent." "The standard of conduct by which the trier of fact must judge the adequacy of [consumer reporting] agency procedures is what a reasonably prudent person would do under the circumstances." *Bryant v. TRW, Inc.*, 689 F.2d 72, 78 (6th Cir.1982) (quoting *Thompson*, 682 F.2d at 513). An FCRA plaintiff "cannot rest on a showing of mere inaccuracy, shifting to the defendant the burden of proof on the reasonableness of procedures for ensuring accuracy[.]" *Stewart v. Credit Bureau, Inc.*, 734 F.2d 47, 51 (D.C.Cir.1984). It is plaintiff's burden to prove that the agency acted unreasonably in the circumstances. *Stewart*, 734 F.2d at 51, n. 5 (collecting cases).

Against this background, I will again separately consider plaintiff's charges against TRW and Trans Union.

*TRW*

■ In opposing TRW's motion for summary judgment, plaintiff is obligated to set forth specific facts showing that a genuine issue exists for trial with respect to TRW's negligence, an issue on which plaintiff bears the burden of proof.

The evidence for TRW is that plaintiff's protest letter, dated July 2, 1991, came into the hands of Helm, the responsible TRW employee, on July 11. There is no evidence that prior to that date, TRW had any reason to believe that plaintiff's report was inaccurate. On the same day, July 11, 1991, Helm sent a CDV to Salon. Salon responded that the indebtedness was indeed ascribable to plaintiff. On July 25, 1991, TRW placed a notation to that effect in plaintiff's credit file, and continued to list the Salon account as a debt. Helm states in her affidavit that it is TRW's practice to send a consumer in plaintiff's position an updated credit report upon completion of the reinvestigation, together with a notice of his right to include his own statement concerning the disputed item in subsequent credit reports. Evidence of that routine practice is relevant to prove that TRW acted in conformity with it on this occasion. Rule 406, Fed.R.Evid. In addition, Helm states that computer-generated TRW documents reflect the sending of this notice to Podell on August 13, 1991.

■ If plaintiff, opposing summary judgment and confronted by this evidence, cannot point to other evidence giving rise to a genuine issue as to a material fact, TRW is entitled to a summary disposition of the FCRA claims against it. That is because there is no evidence that TRW had reason to question the accuracy of the initial information submitted by Salon, and the promptness with which TRW responded to plaintiff's protest constitutes compliance with 15 U.S.C. § 1681i(a) as a matter of law. *See Boothe v. TRW Credit Data*, 768 F.Supp. 434, 438 (S.D.N.Y.1991). TRW's evidence is that it gave plaintiff equally prompt notification of its investigation, and never included a statement from plaintiff disputing the Salon account because plaintiff never asked it to. In the absence of a request from a consumer to do so, a consumer reporting agency's failure

to include such a statement in its reports does not violate the FCRA. *Mirocha v. TRW, Inc*, 805 F.Supp. 663, 670 (S.D.Ind. 1992).

But plaintiff argues in his brief that he never received the update and notice TRW says was sent to him on August 13, 1991, which in turn, plaintiff contends, gives rise to a genuine issue as to the material fact of whether TRW ever sent it.

Plaintiff's brief states at 2 that "[p]laintiff categorically disputes that TRW ever sent him a confirmation of the investigation of plaintiff's disputed entries." That statement constitutes a considerable gloss upon plaintiff's deposition testimony. A time came during that deposition when plaintiff was responding to questions by Bruce Luckman, counsel for Trans Union. Luckman asked plaintiff about the December 3, 1993 letter he sent to Trans Union. This exchange then occurred:

> MR. LUCKMAN: Other than this December 3, 1993 letter, do you have any other letters to Trans Union, that you sent to Trans Union?
>
> THE WITNESS: I think that was the only one.
>
> MR. LUCKMAN: Do you recall what happened in response to that letter?
>
> THE WITNESS: I think nothing happened. Just like when I sent TRW a letter, I never got a response either, which is why a little later I came again and said—

Tr. 129.

Heidi Wendel, counsel for TRW, intervened at that point. According to the deposition transcript, plaintiff testified in response to her questions as follows:

> MS. WENDEL: Wait. You said you got a response back from TRW that you should contact your vendors.
>
> THE WITNESS: That was a phone call.
>
> MS. WENDEL: Their response was that you should contact the vendors?
>
> THE WITNESS: Right. That's not a written response. Probably left me hanging until I was blue in the face, until I started a lawsuit finally.

> MS. WENDEL: Our records show that you were sent a confirmation of the account. You believe that you were not sent anything?
>
> THE WITNESS: No, there might have been a second TRW. What's the difference, you left the bad marks on there and then, you know ... It's possible that I— maybe I got a second one.
>
> MS. WENDEL: A second what?
>
> THE WITNESS: Maybe another TRW was sent after I complained. I followed the procedure, they tell you to circle the things that are wrong and so forth.
>
> MS. WENDEL: So you think you may have gotten a response to that letter? You wrote a letter to TRW?
>
> THE WITNESS: I don't think I ever got a response addressing the problem. Maybe like a second report was sent, that was it. Nobody took the time and effort to see what was up. Obviously you come to your own conclusions.

That testimony echoes testimony given by plaintiff at an earlier stage in his deposition. Counsel for TRW was questioning plaintiff about plaintiff's July 2, 1991 letter to TRW. Plaintiff gave this testimony:

> Q. Do you recognize that document?
>
> A. Yes.
>
> Q. Is that the letter that you're referring to?
>
> A. I think that's the one.
>
> Q. Could you tell me the date?
>
> A. July 2, 1991.
>
> Q. Did you hear back from TRW after sending that letter?
>
> A. I may have gotten another report which was equally as bad. And then they started me on the you have to talk to the vendors. So nice of them to be so helpful—put that down—because I went through twenty years of voice-mail and bureaucracy.

Tr. 21–22.

Far from constituting a "categorical" denial that he ever received a confirmation credit report from TRW, plaintiff's deposition testimony reflects the possibility, if not the likeli-

hood, that he did receive such a communication. The grievance plaintiff voiced at his deposition was not that TRW did not respond, but that he regarded the response as inadequate. Hence his answer at Tr. 131: "I don't think I ever got a response addressing the problem. Maybe like a second report was sent, that was it. Nobody took the time and effort to see what was up."

After plaintiff's deposition was transcribed, the transcript was sent to him for examination and signature. That procedure complied with Rule 30(e) Fed.R.Civ.P., which reads in pertinent part:

> If requested by the deponent or a party before completion of the deposition, the deponent shall have 30 days after being notified by the officer that the transcript or recording is available in which to review the transcript or recording and, if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them.

Plaintiff drew lines through his transcribed answers quoted above so as to delete all references to the possibility that he received a further report from TRW in response to his July 2, 1991 letter, and the sufficiency of its contents. At one point in the transcript as altered by plaintiff, plaintiff added the handwritten notation "I did not receive anything." Tr. 130, line 19. In his written explanation for these alterations, plaintiff stated with respect to each of them:

> Speculation is improper. I did not receive a response to my July 2, 1991 letter to TRW.

Plaintiff undertook to change his deposition testimony on a material matter. He now says, on the altered transcript and in his Rule 30(e) statement, that he did not receive a response to his July 2, 1991 letter to TRW. The deposition testimony, as noted, suggested the receipt by plaintiff of a response which he regarded as unsatisfactory. Certainly plaintiff refrained from testifying at the deposition that he had never received a response.

Plaintiff is not entitled to have his altered answers take the place of the original ones.

His original deposition answers constitute the admissions of a party, and as such form part of the record evidence. *Usiak v. New York Tank Barge Company,* 299 F.2d 808, 810 (2d Cir.1962). A party is then entitled "to introduce the amended answer and explain the reasons for the change." *Usiak* at 810; *see also Lugtig v. Thomas,* 89 F.R.D. 639, 641 (N.D.Ill.1981).

Rule 30(e) allows a deponent to make changes in his deposition "even if the changes contradict the original answers or even if the deponent's reasons for making the changes are unconvincing." *Lugtig v. Thomas,* 89 F.R.D. at 641. The latter principle resonates in the case at bar, because plaintiff's reasons for changing his testimony are unconvincing in the extreme. The explanation plaintiff gives for each of these material changes is: "Speculation is improper." That sounds more like the operation of counsel's mind than that of the plaintiff; and counsel surely would have preferred different answers from plaintiff at the deposition. Plaintiff's subsequent positive assertions that he did not receive a response from TRW cannot be squared with his deposition testimony.

As the cases hold, Rule 30(e) does not require a judge "to examine the sufficiency, reasonableness, or legitimacy of the reasons for the changes." *Lugtig v. Thomas,* 89 F.R.D. at 641. Thus plaintiff's changed answers become part of the record generated during discovery. But the present question is whether the totality of the evidence on this point gives rise to a genuine issue of fact as to whether TRW sent the confirmation and updated report to plaintiff on August 13, 1991, as plaintiff says that it did. It is useful to reflect that the question is not whether plaintiff received that communication, but whether TRW sent it.

On that issue, the only evidence favoring plaintiff lies in the material changes that he made to his deposition. Conceptually, the failure of an individual to receive a mailed communication may form the basis for an inference that the mailing was never sent (although the inference is undermined to some degree by the vagaries of the postal system). I may therefore regard plaintiff's amended answers as a scintilla of evidence in

support of an issue upon which he bears the burden of proof. But I do not think that is enough to entitle plaintiff to avoid summary judgment.

In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Court adopted to Rule 56 summary judgment practice the standards for a directed verdict under Rule 50(a). The Court observed that the existence of some evidence in favor of a nonmoving party did not preclude the granting of a Rule 50(a) motion for a directed verdict. The *Anderson* Court went all the way back to *Improvement Co. v. Munson,* 81 U.S. 442, 14 Wall. 442, 448, 20 L.Ed. 867 (1872), for this analysis:

> Formerly it was held that if there was what is called a **scintilla** of evidence in support of a case the judge was bound to leave it to the jury, but recent decisions of higher authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the **onus** of proof is imposed.

In *Anderson* the Court held that whether the motion arose under Rule 56 or Rule 50(a), "the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2512. Con.

I conclude that the evidence on the issue of whether TRW sent to plaintiff a notification of the result of its investigation is so one-sided that TRW must prevail as a matter of law. TRW submits substantial evidence that it was its practice to send such notice in these circumstances, and that it did so in this case. At his deposition, plaintiff did not deny receiving the notice. His testimony strongly suggests that he did receive it but was dissatisfied by its contents. Plaintiff seeks to avoid those admissions by his changed answers, whose provenance is suspect.

There is no reason to suppose that a trial would develop any further evidence on this issue. Plaintiff, charging TRW with negligence, bears the burden of proving that TRW did not communicate with him after Salon advised TRW that plaintiff was indebted to Salon. On this evidence, a reasonable jury, properly instructed as to burden of proof, could not find that plaintiff had sustained his burden.

Accordingly defendant is entitled to summary judgment dismissing plaintiff's first cause of action against it, charging negligence under 15 U.S.C. § 1681o. It necessarily follows that TRW is also entitled to summary judgment dismissing the second cause of action, charging willful noncompliance with the FCRA under § 1681 n.

*Trans Union*

█   Plaintiff's only possible basis for arguing that Trans Union failed to exercise reasonable care is that Trans Union failed to respond appropriately to the April 18, 1992 fax that Salon's employee Valez told plaintiff he was sending to Trans Union.

There is no documentary proof that Trans Union actually received this fax from Salon. Plaintiff submits a copy of the fax given to him by Valez, but it is unaccompanied by the fax machine-generated confirmation that the addressee received the communication. Trans Union apparently could not find a copy of the fax in its files. But Trans Union's files do reflect that Salon continued to report the account as an indebtedness of plaintiff's, having done so as recently as December, 1993: an indebtedness that Trans Union was entitled to report, at least until it heard from plaintiff directly. As soon as plaintiff communicated with Trans Union, in his letter dated December 3, 1993, Trans Union reacted with appropriate promptness and the information was deleted.

Recognizing again that plaintiff bears the burden of proving Trans Union's negligence, Trans Union is entitled to summary judgment dismissing the first and second causes of action against it, alleging conduct violative of the FCRA.

█   As analyzed above, TRW and Trans Union are entitled to summary judgment dismissing plaintiff's claims that they acted

negligently, in violation of their obligations under the FCRA. This analysis is also sufficient to entitle both defendants to summary judgment dismissing the remaining state and common law claims, pleaded as causes of action Third through Eighth.[3]

Summary judgment as to those claims will be on the merits and with prejudice. Where a federal court's subject matter jurisdiction depends solely upon a federal claim, and the federal claim is dismissed, pendent state and common law claims are frequently dismissed without prejudice. In the case at bar, however, diversity of citizenship furnishes an independent basis for subject matter jurisdiction over these claims. Accordingly the summary disposition in defendants' favor will be with prejudice.

*Damages*

■ As an alternative basis for summary judgment, both defendants argue that plaintiff cannot prove damages as a matter of law. Since I have granted summary judgment to defendants on the issue of liability with respect to all claims, it is not necessary to reach damages issues. However, in the event of a possible reversal on liability issues by the court of appeals, I will deal with the FRCA damages issues in the form of an alternative holding.

A principal item of plaintiff's claimed damages is the lost of an opportunity to participate in a real estate investment venture with an entrepreneur named Scott Jaffee. Jaffee testified by deposition. Jaffee was considering the purchase of two residential real estate properties in Florida. The evidence makes it clear that Jaffee was considering joining with plaintiff in this venture, with plaintiff undertaking to furnish most of the money, but that Jaffee abandoned any thought of doing business with plaintiff after Jaffee obtained, through Daily Reporting Service, copies of plaintiff's credit reports containing the unfavorable information, including the Salon account.

To sustain a claim under the FCRA a plaintiff must prove that inaccurate information in a credit report caused him harm. *Cahlin v. General Motors Acceptance Corp.,* 936 F.2d at 1160–61. Jaffee's testimony establishes a causal connection between the adverse information in the credit reports issued by the defendants and the loss of plaintiff's opportunity to participate with Jaffee in the Florida real estate enterprise.

Nonetheless, this sort of loss is not cognizable under the FCRA.

Plaintiff's hoped-for association with Jaffee in a Florida Real estate venture is a quintessential example of a business transaction. Jaffee obtained copies of plaintiff's credit reports in order to evaluate his desirability as a business partner. However, "[i]t is clear from its legislative history that the [FRCA] was intended to apply only to reports which relate to the consumer's eligibility for personal credit or other commercial benefits as a consumer, and not to the consumer's business transactions." *Boothe v. TRW Credit Data,* 523 F.Supp. 631, 633 (S.D.N.Y.1981) (Motley, J.). Judge Motley quoted the statement on the floor of the House by Representative Sullivan, the FCRA's sponsor:

> The purpose of the Fair Credit Reporting Bill is to protect consumers from inaccurate or arbitrary information in a consumer report which is used as a factor in determining an individual's eligibility for credit, insurance or employment. It does not apply to reports used for business, commercial or professional purposes.

116 Cong.Record 36,572 (1970).

Thus it is generally held that a plaintiff may not recover under the FCRA for losses resulting from the use of the credit report solely for a commercial transaction. *See, e.g., Matthews v. Worthen Bank & Trust Co.,* 741 F.2d 217, 219 (8th Cir.1984) (where plaintiff applied to purchase a store and lease space in a shopping mall, and the partnership owning the mall rejected plaintiff's application after obtaining plaintiff's credit report,

---

**3.** That is because plaintiff's inability as a matter of law to show the defendants were negligent also destroys any basis for these claims. In addition, the state and common law claims for defamation (sixth cause of action) and negligence (eighth cause of action) are preempted by the FCRA, 15 U.S.C. § 1681h(e) unless the agency furnished false information "with malice or willful intent to injure a consumer." There is no evidence of such behavior in this case.

this particular transaction was exempt from the FRCA because the credit report "was used solely for a commercial transaction.").

Plaintiff submits no evidence of any specific losses of the sort that would be cognizable under the FCRA. In certain areas, plaintiff seeks to fashion an FCRA claim out of his personal decision not to apply for credit, because he was certain he would not get it. Plaintiff cites no authority for such a recovery, which would make the FCRA completely overflow the boundaries of causation.

■ However, I conclude that if defendants were liable under the FCRA, plaintiff would have a cognizable claim for emotional distress. Defendants argue that damages for emotional distress or mental suffering are recoverable only if a plaintiff can also prove (as this plaintiff does not) that he applied for consumer credit which was denied on the basis of his credit report. Defendants cite a number of cases where both elements were shown. However, there is no principled reason to conclude that emotional distress can be engendered only by that particular circumstance. *Stevenson v. TRW, Inc.*, 987 F.2d 288 (5th Cir.1993), a case upon which defendants rely, says at 297:

> The record reveals evidence, however, that Stevenson suffered mental anguish over his lengthy dealings with TRW after he disputed his credit report. First, Stevenson testified that it was a "terrific shock" to him to discover his bad credit rating after maintaining a good credit reputation since 1932. Second, Stevenson was denied credit three times during TRW's reinvestigation: by Bloomingdale's, by Bank One, and by Gabbert's Furniture Company. Stevenson testified that he had to go "had in hand" to the president of Bank One, who was a business associate and friend, to explain his problems with TRW. As a result, he obtained credit at Bank One. Third, Stevenson had to explain his credit woes to the president of First City Bank in Colleyville when he opened an account there. When a new president at First City Bank, Stevenson had to explain his situation again. despite the fact that he was ultimately able to obtain credit, Stevenson testified to experiencing "considerable embarrassment" from having to detail to business associates and credits his problems with TRW. Finally Stevenson spent a considerable amount of time since he first disputed his credit report trying to resolve his problem with TRW.

The first and last of these factors, all of which the Fifth Circuit appears to regard as viable, have nothing to do with a specific denial of credit. These bases for mental anguish articulated in *Stevenson* apply by analogy to plaintiff. He was a young lawyer whose credit reports came under the scrutiny of the Connecticut Bar Association. He was required to engage in considerable correspondence with the defendants. If plaintiff were in a position to demonstrate negligence on the part of defendants, that conduct would support a claim for emotional distress. The reported cases indicate that damages awarded under this heading are modest in amount; but I conclude that, were there liability on the part of the defendants, the claim would be cognizable in law.

### CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment are granted.

The Clerk of the Court is directed to enter judgement in favor of defendants TRW, Inc. and Trans Union Corporation dismissing the first amended complaint against them with prejudice.