**Kathleen SCHARPF Plaintiff**

v.

**AIG MARKETING, INC.,
et al. Defendants**

No. CIV.A.3:00–CV–614(H).

United States District Court,
W.D. Kentucky.

Jan. 30, 2003.

David B. Mour and Jeffrey A. Cross, Borowitz & Goldsmith, Louisville, KY, for plaintiff.

Thomas M. Hefferon, Jaren D. Wilcoxson, Goodwin Procter LLP, Washington, DC, for defendants.

### MEMORANDUM OPINION

HEYBURN, Chief Judge.

Plaintiff Kathleen Scharpf has filed a ten-count complaint alleging that, in obtaining her consumer report, Defendants AIG Marketing, Inc. ("AIG"), MBNA Insurance Agency ("MBNA"), and "Unknown Persons," violated the Fair Credit

Reporting Act, 15 U.S.C. § 1681 *et seq.*, invaded her privacy in violation of Kentucky common law, and engaged in an unlawful civil conspiracy.[1] The centerpiece to Plaintiff's FCRA allegations has been her contention that AIG lacked a "permissible purpose" to obtain her credit report. The cross motions for summary judgment focused on this issue. This Court limited the parties' discovery efforts to "the issue of the applicability to the defendants' conduct of the 'underwriting exception' to liability under the Act." While this may not be the only dispositive legal issue, for the reasons set forth below, Plaintiff's motion for summary judgment on this narrow issue is denied. Further discovery, however, could support the allegations contained in the complaint. Therefore, the Court will not dismiss all of Plaintiff's underlying claims.

## I.

The Court is presented with a narrow question related to the legality of what transpired during an August 1999 phone conversation between Plaintiff and AIG. The facts are best considered in two parts at this stage, looking briefly at the AIG–MBNA call transfer program, and then considering the phone conversation in issue.

This case arises out of a telemarketing relationship. AIG and MBNA are business partners and operate the MBNA Call Transfer Program.[2] In practice, according to Steven F. Wardzinski, president of the Sponsored Business Division of AIG, the Program operates as follows. While speaking by telephone to an MBNA representative about her credit card account, the MBNA account holder is typically asked if she would like to receive a "free, no obligation quote" for automobile insurance. If the consumer accepts the offer, she is immediately telephonically transferred to a waiting AIG representative who then requests information from the consumer, such as her name, address, type of vehicle, and social security number. Based on this information, the AIG representative, utilizing a computer program, calculates a quote. As part of this process, AIG's computer program automatically orders the credit score (which itself is based on information obtained from the consumer's credit report), and inputs this three-digit number into the program to determine the quote.

The relevant events begin on August 6, 1999, when Plaintiff spoke by telephone to MBNA, with whom she had a credit card, and consented to the transfer to an AIG representative. At the time, Plaintiff's current automobile insurance policy was about to expire and she decided to compare rates. During the brief conversation, the AIG representative asked Plaintiff a series of questions, including a request for her social security number. Whether or not Plaintiff provided this in response is a critical fact in dispute.[3] Through some

---

**1.** Plaintiff has made eight claims related to the FCRA. Specifically, Count One alleges AIG negligently failed to comply with the FCRA's requirements. 15 U.S.C. § 1681*o*. Count Two alleges AIG willfully violated the FCRA. 15 U.S.C. § 1681n. Count Three alleges that AIG obtained her consumer report under false pretenses in violation of 15 U.S.C. § 1681q. Counts Four, Five, Six, Seven, and Nine allege that "Unknown Persons" who were "employees of AIG and/or MBNA" should be held personally liable for participat-

ing in the process by which her consumer report was obtained and used by AIG.

**2.** Except from argument in chambers, the Court does not have any account from AIG and MBNA concerning their relationship. This summary of the facts is therefore culled primarily from Plaintiff's statements of facts and the relevant depositions.

**3.** At this stage, the Court finds this important fact is irrelevant in determining the narrow

undetermined means, AIG nevertheless obtained access to her consumer report from Trans Union. As a result, AIG offered her an immediate rate quote. That rate quote was significantly higher than Plaintiff's current automobile insurance premium. So, Plaintiff stated she was not interested and terminated the conversation. Notwithstanding this rejection, AIG subsequently sent her a written application urging her to purchase the insurance at the offered rate.

Nearly one year later, while reviewing her credit report in July of 2000, Plaintiff noticed a record of AIG obtaining her consumer report on August 6, 1999. Plaintiff has now sued AIG and MBNA claiming that AIG's process of obtaining of her consumer report violated the FCRA, invaded her privacy, and was the product of an unlawful civil conspiracy.

## II.

This case poses a difficult and important issue of first impression. Namely, under the FCRA, can an insurance company obtain a consumer report, prior to the consumer's unequivocal application, in order to issue an insurance quote?[4] This is an important issue because apparently a vast percentage of insurers may obtain consumer reports in a similar manner prior to receiving a specific application.

In 1970 Congress amended the Consumer Credit Protection Act, 15 U.S.C. § 1601 *et seq.*, by adding a number of provisions collectively known as the Fair Credit Reporting Act ("FCRA"). The FCRA provides the exclusive circumstances under which a credit reporting agency may furnish a credit report to another. *See* 15 U.S.C. § 1681b(a)(2). Insurance companies may be held liable under the FCRA because they must comply with the FCRA's terms in handling an insured's credit report. *St. Paul Guardian Ins. Co. v. Johnson*, 884 F.2d 881, 883 (5th Cir.1989). As a result of congressional amendments in 1997, the FCRA now lists six limited "permissible purposes" for which a consumer reporting agency can provide a consumer report to third parties. *See* 15 U.S.C. § 1681b(a). The FCRA authorizes third parties, such as AIG, to obtain and use consumer reports only if they act in accordance with one of these permissible purposes. *See* 15 U.S.C. § 1681b(f)(1).[5] Both sides agree that the singular "permissible purpose" applicable here is the provision that a third-party may obtain the consumer's report if it "intends to use the information in connection with the underwriting of insurance involving the customer." 15 U.S.C. § 1681b(a)(3)(C). Plaintiff's claim implicitly contains important questions of law and fact.

---

legal question at hand. Nevertheless, it may be important in future litigation in this case that Plaintiff asserts that, "being very protective of her privacy," she "never gave her social security number to the AIG[M] representative."(Scharpf.Depo., pg.61–63). In contrast, Defendants argue that because, as a matter of fact according to Mr. Wardzinki, AIG has no other way of obtaining a consumer's Social Security number other than from a consumer, "Ms. Scharpf's memory appears to have betrayed her." Another possibility is that AIG gained access to the consumer credit report without aid of the social security number.

4. To date, only one federal court has considered this issue concluding in a remarkably brief opinion that such a scheme was permissible under the FCRA's text. *Wilting v. Progressive County Mutual Insur. Co.*, 227 F.3d 474 (5th Cir.2000).

5. Specifically, the FCRA states, "A person shall not use or obtain a consumer report for any purpose unless ... the consumer report is obtained for a purpose for which the consumer report as authorized to be furnished under this section." 15 U.S.C. § 1681b(f)(1).

## A.

■ Plaintiff first argues that, as a matter of law, the underwriting purpose is inapplicable here because she never "applied" for insurance. Because she never made an application for insurance, Plaintiff contends AIG had no right to access her credit report even if it was performing an underwriting function. The Court disagrees. Several basic principles of statutory construction compel this outcome. In addition, such a construction satisfies the balance Congress intended by enacting the FCRA.

As a starting point, to explore Plaintiff's argument fairly, the Court's analysis begins by examining that language. *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 739, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). Tellingly, Section 1681b(a)(3)(C)'s text does not contain an "application" requirement, certainly not an explicit one. To the contrary, the underwriting provision permits a consumer reporting agency to furnish a report to a company which *intends* to use the information *in connection with* the *underwriting* of insurance. 15 U.S.C. § 1681b(a)(3)(C). This statutory language does not limit the underwriting purpose to those occasions after someone has *applied* for insurance; nor, as Plaintiff would prefer, does it limit this purpose to obtaining a consumer report with the consumer's knowledge. The three terms which Congress used to define this permissible purpose suggest that this conclusion is both correct and sensible within the FCRA's overall scheme.

■ First, Congress did not restrict the scope of the permissible distribution of a report to companies like AIG who can prove they will use a consumer report for underwriting. Rather, consumer credit companies are permitted to furnish the reports where a third party, such as AIG, demonstrates an *intent* to use the report for the authorized purpose. *See, e.g.,* *Yang v. Government Employees Insur. Co.,* 146 F.3d 1320, 1325 (11th Cir.1998) (noting that there are three potential types of use that might exist under this section: ultimate use, expectation of use, and the purpose for compiling the report, and concluding that only one of those purposes is necessary to meet a "permissible purpose" provision); *Korotki v. Attorney Servs. Corp.,* 931 F.Supp. 1269, 1276 (D.Md.1996) ("[S]o long as a user has reason to believe that a permissible purpose exists, that user may obtain a consumer report without violating the FCRA"). Second, Webster's Dictionary defines "connection" as "an association or relationship; logical ordering of words or ideas." Webster's II New Riverside Dictionary 300 (1994). Thus, both the practical and strict definitional applications suggest that a consumer reporting agency may provide a consumer report without evidence that a consumer has made an application. Consequently, it is counterintuitive to suggest that the recipient would need an application before using the information which the consumer credit agency had legally provided.

Third, while Congress did not define the word "underwriting," the Federal Trade Commission ("FTC"), as the agency authorized with administering the FCRA, 15 U.S.C. § 1681s(a), has provided a definition. That definition states, "An insurer my obtain a consumer report to decide whether or not to issue a policy to the consumer, the amount and terms of the coverage, the duration of the policy, the rates or fees charged, or whether or not to renew or cancel a policy, because these are all 'underwriting' decisions." FTC Commentary on the Fair Credit Reporting Act, 16 C.F.R. pt. 600, App.; *see also Wilting,* 227 F.3d at 476 (adopting the FTC's definition). Similarly, in defining "consumer report," the FCRA states that information on an individual may be obtained "for the purpose of serving as a factor in establishing the consumer's *eligibility* for" insur-

ance. 15 U.S.C. § 1681a(d)(1). None of these definitions suggest that an application is the pre-condition to this permissible purpose. Rather, the terms intimate an insurer may examine a consumer's credit report to assess the risks that person poses.

Another cardinal principle of statutory construction supports this interpretation. *Duncan v. Walker*, 533 U.S. 167, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001). That principle says that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Id.; see United States v. Menasche*, 348 U.S. 528, 538–539, 75 S.Ct. 513, 99 L.Ed. 615 (1955). Plaintiff argues repeatedly that "the term 'application' and derivations thereof are used more than a dozen times in the FCRA." Pl.'s Mot. Summ. J. at 16. Plaintiff specifically relies on the FCRA's use of "applicant" in the permissible purpose pertaining to a consumer's application "for a license or other benefit granted by a governmental instrumentality." *Id.* at 17–18; 15 U.S.C. § 1681b(a)(3)(D).[6] Were this Court to adopt Plaintiff's construction of the statute and infer that the term "application" is a prerequisite to triggering every "permissible purpose," simply because it appears in the text of one permissible purpose, the express use of the term "applicant" in § 1681b(a)(3)(D) "would be rendered insignificant, if not wholly superfluous." *TRW, Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001). This court is "reluctant to treat statutory terms as surplusage in any setting," and declines to do so here. *Id.*

The principle that a statute should be read and construed as a whole is also germane here. *United States v. American Trucking Ass'ns, Inc.*, 310 U.S. 534, 542–43, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). That is, in the context of the overall statutory scheme, § 1681b(a)(3)(C) is better read *not* as restricting this permissible purpose to instances where a consumer has submitted a written application, but instead as setting up a safeguard to ensure that a user of a consumer report is operating with a permissible purpose, *when it lacks the consumer's express permission.* This is an important distinction. Though neither party focuses on it, the underwriting permissible purpose is itself not an unlimited source of power. In FCRA's permissible purpose section, Congress began its enunciation of the six permissible purposes by noting their scope was "[s]ubject to subsection (c) of this section." 15 U.S.C. § 1681b(a).[7] Subsection (c), in turn, imposes limitations on cases where the consumer does not initiate the transaction.[8] That section of the FCRA states:

**6.** In its entirety, § 1681b(a)(3) states that a person may obtain a consumer report if he "intends to use the information in connection with a determination of the consumer's eligibility for a license or other benefit granted by a governmental instrumentality required by law to consider an applicant's financial responsibility or status."

**7.** The entire text of the introduction states, "In general-Subject to subsection (c) of this section, any consumer reporting agency may furnish a consumer report under the following circumstances and no other." 15 U.S.C. § 1681b(a).

**8.** Those limitations are as follows:

(c) Furnishing reports in connection with credit or insurance transactions that are not initiated by the consumer.
(1) In general. A consumer reporting agency may furnish a consumer report relating to any consumer pursuant to subparagraph (A) or (C) of subsection (a)(3) in connection with any credit or insurance transaction that is not initiated by the consumer only if—
(A) the consumer authorizes the agency to provide such report to such person; or
(B) (i) the transaction consists of a firm offer of credit or insurance;
(ii) the consumer reporting agency has complied with subsection (e); and

A consumer reporting agency may furnish a consumer report relating to any consumer pursuant to [the underwriting permissible purpose set forth in] this section in connection with any credit or insurance transaction that is not initiated by the consumer only if-(A) the consumer authorizes the agency to provide such report to such person; or (B)(I) *the transaction consists of a firm offer of credit or insurance* [and the consumer has not elected to be excluded from identified lists].

15 U.S.C. § 1681b(c)(1).

The FCRA elsewhere defines "firm offer of credit or insurance," to be "any offer of credit or insurance to a consumer that will be honored if the consumer is determined, based on information in a consumer report on the consumer, to meet the specific criteria used to select the consumer for the offer." 15 U.S.C. § 1681a(1).[9] Thus, the FCRA seems to contemplate that a company may obtain a consumer report without the consumer's application or knowledge, if it provides a firm offer in connection with one of the permissible purposes. For purposes of this analysis the Court must assume that AIG through its agent MBNA initiated the transaction.[10] According to

---

(iii) there is not in effect an election by the consumer, made in accordance with subsection (e), to have the consumer's name and address excluded from lists of names provided by the agency pursuant to this paragraph.
(2) Limits on information received under paragraph (1)(b). A person may receive pursuant to paragraph (1)(B) only—
(A) the name and address of a consumer;
(B) an identifier that is not unique to the consumer and that is used by the person solely for the purpose of verifying the identity of the consumer; and
(C) other information pertaining to a consumer that does not identify the relationship or experience of the consumer with respect to a particular creditor or other entity.
(3) Information regarding inquiries. Except as provided in section 609(a)(5) [15 USCS § 1681g(a)(5) ], a consumer reporting agency shall not furnish to any person a record of inquiries in connection with a credit or insurance transaction that is not initiated by a consumer.
15 U.S.C. § 1681b(c).

**9.** In its entirety, the definition of "firm offer of credit or insurance" provides as follows: The term "firm offer of credit or insurance" means any offer of credit or insurance to a consumer that will be honored if the consumer is determined, based on information in a consumer report on the consumer, to meet the specific criteria used to select the consumer for the offer, except that the offer may be further conditioned on one or more of the following:

(1) The consumer being determined, based on information in the consumer's application for the credit or insurance, to meet specific criteria bearing on credit worthiness or insurability, as applicable, that are established—
(A) before selection of the consumer for the offer; and
(B) for the purpose of determining whether to extend credit or insurance pursuant to the offer.
(2) Verification.
(A) that the consumer continues to meet the specific criteria used to select the consumer for the offer, by using information in a consumer report on the consumer, information in the consumer's application for the credit or insurance, or other information bearing on the credit worthiness or insurability of the consumer; or
(B) of the information in the consumer's application for the credit or insurance, to determine that the consumer meets the specific criteria bearing on credit worthiness or insurability.
(3) The consumer furnishing any collateral that is a requirement for the extension of the credit or insurance that was—
(A) established before selection of the consumer for the offer of credit or insurance; and
(B) disclosed to the consumer in the offer of credit or insurance.
15 U.S.C. § 1681a(1)

**10.** AIG disputes this conclusion and argues that Plaintiff initiated the transaction by agreeing to the call transfer.

Wardzinski, the quote provided by AIG over the phone was binding on AIG for sixty days and was available if the Plaintiff completed the written application for the insurance. (Wardzinki Dep. at 34, 54, 61–64, 88). In this way, then, Plaintiff's experience was no different from the unhappy consumer who discovers a credit card company legally obtained her credit history without her authorization in order to make her a credit card offer, subject to the approval of her application. *See Baker v. American Express,* 2002 WL 1205065, *2, 2002 U.S. Dist. LEXIS 10005, *6–*7 (W.D.Ky.2002). Nevertheless, by making the firm offer, AIG has complied with the protections established in the FCRA.

■ This more complete and logical reading of § 1681b(a)(3)(C) shows that it restricts an insurer's access to a consumer's credit report, by requiring a legitimate underwriting use, *and* by requiring either the consumer's express permission *or* the making of a firm offer. This interpretation eminently comports with what Congress intended for the FCRA. In enacting the FCRA, Congress made four findings, three of which are particularly relevant to the question of law Plaintiff poses. Those pertinent findings state:

> (2) An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

> (3) Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

> (4) There is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a).
In effect, the FCRA created a fair mechanism through which creditors and insurers could obtain a consumer's report in order to make an offer and evaluate creditworthiness. Conversely, it also established procedures to ensure accuracy and to protect consumer privacy. The FCRA strikes a balance between these two competing ends.

Evidence of this give and take is prevalent throughout the FCRA. When preparing a report, a consumer reporting agency must follow *"reasonable* procedures to assure *maximum possible accuracy."* 15 U.S.C. 1681e(c) (emphasis added). The stated aim is therefore perfection in protecting the consumer, but the burden on the credit reporting agency is only to act reasonably. Similarly, it is *presumed* that a consumer's *privacy will not be violated* in the context of a firm offer for a permissible purpose, unless that consumer personally seeks to have her name removed from a consumer reporting agency's list. 15 U.S.C. § 1681b(c). Moreover, if a plaintiff seeks to bring a state law defamation, invasion of privacy, or negligence reporting claim against a consumer reporting agency, she can succeed only upon overcoming the highest standard of malice. 15 U.S.C. § 1681h(e). Last, only *after* a creditor or insurer takes action against a consumer's interest, is that consumer informed of her right to see their credit report or know that it was used against her. 15 U.S.C. § 1681a(k). Taken together these provisions illustrate that 15 U.S.C. § 1681b(a)(3)(C), even absent the "application" requirement Plaintiff asks this Court to impute, is consistent with Congress's clear desire to allow some carefully proscribed investigation into a consumer's credit history, even without his knowledge or consent.

**B.**

■ Turning once again to the facts in this case, Plaintiff contends that she did not make an "application." Despite Plain-

tiff's assumption to the contrary, this fact is disputed. Even assuming the Court did agree with Plaintiff on her legal argument, a reasonable person could conclude, based on the evidence presently before the Court, that AIG did overcome this implicit "application" requirement. This disputed fact makes the grant of summary judgment improper.

According to her deposition, Plaintiff agreed to the phone transfer and then provided some detailed information, like that one would provide on a written application. Among those pieces of information were her name, address, the make and model of her car, specific information about her driving history, and her desired policy coverage. (Scharpf Dep. at 69–72, 95–96). Plaintiff has since stated that she was aware the quote the insurer provided her was subject, in the same way her written application would be, to "the background checks [of her] the driving record, to verify the appropriate rates that they gave [her]." (*Id.* at 37, 39, 43). Thus, the only major distinction between what Plaintiff would term "an application" and what a reasonable person could term an "application" appears to be an unequivocal statement to her that, by providing this information, she was applying for insurance.

This very factual scenario highlights another failing of Plaintiff's legal argument. As a practical matter, Plaintiff's argument is not workable in this context. Defendants are legally bound not to obtain the Plaintiff's credit report unless they use it "in connection with the underwriting of insurance." Both parties agree that the Defendants were involved in underwriting; Plaintiff's claim is only that the FTC and

Congress simply did not intend for this provision to kick in until a consumer made an "application." But determining when the application process formally begins would either have this Court add an extra requirement for all insurance companies, or would inject the Court into every phone call to determine whether the consumer believed she had made an application. Neither of these outcomes is either appropriate or necessary in this context. Although the FCRA as it stands is not perfect, it does contain a reasonable number of protections which, when enforced, strike the proper balance between protecting business and consumer rights. Despite Plaintiff's well-formulated arguments, the Court simply cannot reach her conclusions. Therefore, the Court concludes that neither the specific statutory language nor the FCRA's broad purposes require an application for insurance in order to justify access to a credit report.

### III.

In the process of arguing the interpretation of the FCRA, the parties raise two important issues which the Court believes deserve a direct response. Those issues are noted at this time with the hope that it might focus the parties in the future course of their litigation.

### A.

■ First, after careful consideration, the Court has declined to give substantial deferential weight to the assorted pieces of non-binding Federal Trade Commission ("FTC") interpretations. Several important factors that led to this conclusion.[11]

Plaintiff argues this Court should look to is an Informal Staff Opinion Letter. *See*

---

**11.** Plaintiff has argued at length that this Court is bound by certain FTC commentary and definitions. However, Plaintiff has not explained why, in accordance with basic principles of administrative law, the FTC's definitions, sample notices, and informal opinions are binding, persuasive, or what level of deference is proper under these circumstances. After analyzing the law in this respect, the Court for the reasons explained herein, concludes it is not bound to adopt the conclusions in these different pieces of information.

FTC Informal Staff Opinion Letter, David Medine (Feb.11, 1998). That letter states that where a consumer asks a car dealer questions about prices and financing, "The customer may simply be comparison shopping. In such a situation, the dealer must obtain written permission from the consumer before obtaining a consumer report." *Id.* The scope of the inquiry in that case, however, dealt with *a different section of the act.* Specifically, the FTC was asked whether, *consistent with § 1681b(a)(3)(F)'s permissible purpose,* an auto dealership could obtain a consumer report on an individual who visits a showroom and thus "in connection with a business transaction that is initiated by the customer." [12] In interpreting that provision, the FTC advised that the customer did not trigger the permissible purpose until she was *knowingly* initiating a transaction, as opposed to asking general questions about prices. As a legal matter, the FTC opinion letter specifically clarified when a consumer "initiated" a transaction, not when "underwriting" began. For this reason, the Court is reluctant to hold that an informal agency opinion relating to the sale of cars and the "business transaction" permissible purpose should also control the underwriting of insurance and its unique permissible purpose. Our case involves an altogether different situation and a different statutory provision. Had Congress intended the same set of rules for these two situations, it would not have carved out two separate exceptions written at different levels of generality.

Plaintiff also points to the FTC's example of what type of notice a credit reporting agency should give to a user of a consumer report. Importantly, the FTC provided its sample notice in response to Congress's directive in 15 U.S.C. § 1681e(d), requiring that a consumer reporting agency provide to any company "(A) who regularly and in the ordinary course of business furnishes information to the agency with respect to any consumer; or (B) to whom a consumer report is provided by the [credit reporting] agency; a notice of [the receiving company's] responsibilities under this subchapter." The FCRA further notes that, after the FTC prescribes the content of that notice, "a consumer reporting agency shall be in compliance with this subsection if it provides a notice ... that is *substantially similar* to the FTC prescription." 15 U.S.C. § 1681e(d)(2) (emphasis added). The FTC draft notice states that "users must have a permissible purpose" and paraphrases the underwriting permissible purpose as follows: "For the underwriting of insurance as a result of an *application* from a consumer." 16 C.F.R. § 601 App. C (emphasis added). To be sure, one could say that the FTC sample notice implies that only an application can trigger a permissible purpose.

Under the FCRA, the FTC is the agency empowered to enforce the Act. 15 U.S.C. § 1681s(a). Plaintiff does not go so far, however, to argue that the FTC's sample notice is entitled to the level of deference set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (in appropriate circumstances, agency determination is binding unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to statute). Based upon the circumstances through which this draft notice was published, the Court agrees.

If the FTC's draft notice had been adopted in a rulemaking or other formal proceeding, *Chevron* deference would be

---

12. In its entirety, § 1681b(a)(3)(F) states that a person may obtain a consumer report if he "otherwise has a legitimate business need for the information in connection with a business transaction that is initiated by the consumer."

appropriate. Instead, the FTC itself clearly states, "[t]he Commentary does not have the force or effect of regulations or statutory provisions." C.F.R. Pt. 600 A, Introduction ¶ 1. Recent Supreme Court cases emphasize that such agency statements do not deserve broad *Chevron* deference. *See United States v. Mead Corp.*, 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001); *Christensen v. Harris County*, 529 U.S. 576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). In *Christensen*, the Supreme Court held that "interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference." 529 U.S. at 587, 120 S.Ct. 1655. "Instead," the Court continued, "interpretations contained in formats such as opinion letters are 'entitled to respect' . . . but only to the extent that those interpretations have the 'power to persuade.'" *Id.; see also Navarro v. Pfizer Corp.*, 261 F.3d 90 (1st Cir.2001); *Catskill Mts. Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481 (2nd Cir.2001); *AFGE, Local 2119 v. Rumsfeld*, 262 F.3d 649 (7th Cir. 2001); *Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*, 260 F.3d 1365 (Fed.Cir.2001).

However, as *Mead* and *Christensen* make clear, courts do not face a choice between *Chevron* deference and no deference at all. Administrative decisions not subject to *Chevron* deference may be entitled to a lesser degree of deference; the agency position should be followed to the extent persuasive. *See Mead* 533 U.S. at 228, 121 S.Ct. 2164; (*citing Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). For the reasons that follow, however, the Court does not find the FTC's position to be persuasive.[13] Most importantly, although the agency uses the term "application," there is *no* evidence that the FTC gave its use of this term any special consideration or was moved to use that term for any particular reason. In fact, as this Court has already noted, the FTC's definition of underwriting makes absolutely no mention of an "application" requirements needed to trigger that process; the FTC itself therefore, on this question, takes inconsistent positions.[14] Rather, the fact that a consumer reporting agency will not violate this act if it issues its own notice "substantially similar" to the FTC's draft notice suggests the "application" requirement is hardly equivocal. *See* 15 U.S.C. § 1681e(d)(2).[15] The FTC opinion letter and commentary,

**13.** As the Supreme Court recently noted in *Mead*, 533 U.S. 218, 121 S.Ct. 2164, Justice Jackson's enunciation of the *Skidmore* test is as follows,

"The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."

*Skidmore*, 323 U.S. at 140, 65 S.Ct. 161.

**14.** The FTC's definition of "underwriting" states, "An insurer my obtain a consumer report to decide whether or not to issue a policy to the consumer, the amount and terms of the coverage, the duration of the policy, the rates or fees charged, or whether or not to renew or cancel a policy, because these are all 'underwriting' decisions." FTC Commentary on the Fair Credit Reporting Act, 16 C.F.R. pt. 600, App.; *see also Wilting*, 227 F.3d at 476 (adopting the FTC's definition).

**15.** Importantly, the Court briefly notes that, even applying a full *Chevron* analysis, Plaintiff would probably fail on this point. The Supreme Court has established a two-step process for reviewing an agency's interpretation of a statute that it administers. *Chevron*, 467 U.S. 837, 104 S.Ct. 2778 (1984). "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is

therefore, while deserving consideration, are neither binding nor persuasive. The Court does not believe that the FTC sample notice should decide this case.

### B.

A second remaining question concerns Plaintiff's rights in the event of an "adverse action." The statute defines adverse action to include any act against a consumer, such as offering a higher rate or refusing to offer any insurance, that is made in reliance on their credit report. 15 U.S.C. § 1681a(k)(1)(B)(I).[16] Clearly, such an action has occurred here. Defendants acknowledge access to the credit report or its results; they also used the report to take an adverse action. In such an event, Defendants must follow several procedures that include notifying the Plaintiff of her

right to look at her credit report. 15 U.S.C. § 1681m(a). The Defendants did not do this. They say such action was not required because the "adverse action" requirement only applies to cases where the plaintiff is obtaining a quote on insurance, *existing or applied for.* 15 U.S.C. § 1681a(k)(1)(B)(I). In other words, Defendants say: (1) they can access her insurance without her permission because the permissible purpose exception does not require an application, but (2) they may treat her "adversely" as to her auto insurance without any notice to her, because she had not yet applied. In effect, they argue that the "adverse action" provision and the "permissible purpose" section of the FCRA do not fit perfectly together; one can access a report with a permissible purpose but is not subject to the adverse

---

the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Jewish Hosp., Inc. v. Sec'y of Health & Human Servs.,* 19 F.3d 270, 273 (6th Cir.1994) The Supreme Court has explained that "the judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. 2778.

Applying step one of *Chevron,* the Court is persuaded that the statute in this case is clear; Congress did not intend to prevent using a consumer report for the purposes of underwriting *only after* a customer had made a formal application. Rather, as discussed throughout this opinion, the FCRA is a notice statute. There are instances where a company may obtain a consumer's credit report without their permission or advance knowledge, so long as that company subsequently *notifies* the consumer of its usage. The words used as well as the different parts of the statute when considered together demonstrate this clarity.

**16.** The pertinent portions of 15 U.S.C. § 1681a(k) state:

 (k) Adverse action.
 (1) Actions included. The term "adverse action"—

(A) has the same meaning as in section 701(d)(6) of the Equal Credit Opportunity Act [15 USCS § 1691(d)(6)]; and
(B) means—
(I) a denial or cancellation of, an increase in any charge for, or a reduction or other adverse or unfavorable change in the terms of coverage or amount of, any insurance, existing or applied for, in connection with the underwriting of insurance;
(ii) a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee;
(iii) a denial or cancellation of, an increase in any charge for, or any other adverse or unfavorable change in the terms of, any license or benefit described in section 604(a)(3)(D) [15 USCS § 1681b(a)(3)(D)]; and
(iv) an action taken or determination that is—
(I) made in connection with an application that was made by, or a transaction that was initiated by, any consumer, or in connection with a review of an account under section 604(a)(3)(F)(ii) [15 USCS § 1681b(a)(3)(F)(ii)]; and
(II) adverse to the interests of the consumer.

action requirements. Plaintiff highlights this incongruity to argue that Defendants can "have it both ways."

Admittedly, the scope of the "adverse action" provision is not presently and may never be directly at issue. However, both Plaintiff and Defendants used the "adverse action" provision to make their respective statutory arguments. Therefore, this discussion both supports and lends proper context to the Court's conclusions in Section II of this Memorandum. To accept Defendants' argument one must admit to a vast loophole in the statute which establishes a process quite contrary to the FCRA's essential purposes. The only logical recourse is to conclude that the language in § 1681 a(k)(1)(B)(I) does not precondition an insurance company's adverse action duties on the making of a formal written application. In fact, the Court finds ample support for this conclusion at this stage.

The legislative history of this section suggests that Defendants are wrong—the adverse action section is to be read broadly, "It is the Committee's intent that, whenever a consumer report is obtained for a permissible purpose under Section 604(a), any action taken based on that report that is adverse to the interests of the consumer triggers the adverse action notice requirements under section 615." H.R.Rep. No. 103–486 at 26 (1994); *see also* H.R.Rep. No. 102–692 at 21 (1992), and S.Rep. No. 103–209, at 8 (1993). Similarly, although not binding, the FTC has taken a similar positions in an informal opinion letter addressing a related question. *See* FTC Informal Staff Opinion Letter, Hanna A. Stires (Mar. 1, 2000) (adopting the aforemetioned legislative history and concluding that "[i]n sum, the legislative history indicates that the term 'adverse action' should be read broadly in to include *any action* taken *whenever a credit report is obtained for a permissible purpose* that is 'adverse to the interests of the consumer' "). At this time, the Court also reads the statute in the same way.

## IV.

 Having concluded that Defendant AIG had a permissible purpose when it obtained Plaintiff's consumer credit report, the Court now considers, in light of Defendant's cross-motion for summary judgment on all counts, each claim made in Plaintiff's complaint. In reaching these conclusions, this Court's February 1, 2001 Order limiting the parties' discovery is particularly determinative. Up to this point, all discovery has focused on facts pertinent to AIG's compliance with the FCRA and its underwriting processes. Genuine issues of material fact remain and subsequent discovery will be necessary.

As to Counts I and II, the Court is finding that AIG did have a permissible purpose in obtaining Plaintiff's credit report, does not decide whether AIG negligently or willfully violated the FCRA's requirements. Many of AIG's actions were highly suspect, including its treatment of customers unwilling to provide their social security numbers [17] and the

---

**17.** Discovery this far has shown that AIG does not appear to be entirely honest with its customers in collecting information. According to the AIG caller instructions, if an AIG representative is asked by the consumer why a social security number is necessary, the AIG representative is instructed to state that the customer files are all indexed by social security number. In truth, however, Donald Procopio, senior vice president of AIG, testified at his deposition that AIG requests the consumer's social security number in order to facilitate obtaining the consumer's credit report. (Procopio Depo. at 57.) Consistent with this finding, Wardzinski further stated at his deposition that AIG indexes its files according to customer ID numbers that bear no relationship to a customer's SSN. (Wardinzki Depo. at 150.)

apparent adverse action that probably occurred. Plaintiff has generally plead violations of 15. U.S.C. § 1681*o* and 15 U.S.C. § 1681n though it does not appear to press the "adverse action" aspect of these sections. Whether Plaintiff wants to pursue those other potential violations, whether she must amend her complaint to do so and whether any other defenses would bar such claims are issues which remain unresolved. Therefore, the Court will retain Counts I and II of the Plaintiff's complaint at least for the present time.

In Count III, Plaintiff alleges that AIG obtained and used her report under false pretenses in violation of the FCRA. 15 U.S.C. § 1681q. It is well-established that if a person obtains and uses a consumer report pursuant to a valid permissible purpose authorized by the FCRA, 15 U.S.C. § 1681b, it cannot be liable under a false pretenses theory. *See Duncan v. Handmaker,* 149 F.3d 424, 429 (6th Cir. 1998); *Zamora v. Valley Fed. Sav. & Loan Ass'n,* 811 F.2d 1368, 1370 (10th Cir.1987). Because the Court concludes AIG had a permissible purpose for obtaining the Plaintiff's credit report, Count III is dismissed.

At this stage, the Court also must deny Defendant's motion to dismiss Count VIII, Plaintiff's state law invasion of privacy claim. Although it is true this Court held in *McAnly v. Middleton & Reutlinger,* 77 F.Supp.2d 810, 815 (W.D.Ky.1999), that a state law privacy claim cannot be based on a lawful disclosure under the FCRA, that case involved a claim in which the disclosure was concomitantly found to be lawful. The Court has not yet made its final determination on that point in this case. Rather it has more narrowly concluded that AIG had a permissible purpose to obtain the report; whether or not the rest of its actions—in particular how it went about obtaining Plaintiff's social security num-

ber—were permissible the Court is not prepared to say.

The Court denies Defendants' motion to dismiss Count X, Plaintiff's allegation that AIG and MBNA's conduct constituted an unlawful civil conspiracy. Under Kentucky law, a civil conspiracy is a "corrupt or unlawful combination or agreement between two or more persons to do by concerted action an unlawful act, or to do a lawful act by unlawful means." *McDonald v. Goodman,* 239 S.W.2d 97, 100 (Ky.1951). AIG has admitted that it had a contractual relationship with MBNA and there is some question as to how or where AIG obtained the Plaintiff's social security number. The facts thus far create the possibility that subsequent discovery might reveal that AIG had a permissible purpose when it obtained Plaintiff's consumer report, but that it nevertheless obtained that report through an unlawful means.

Finally, Plaintiff at this stage has yet to identify any "Unknown Persons" who, as employees of AIG and MBNA, should be held personally liable for their actions. Therefore, Counts IV, V, VI, VII, and IX are also dismissed.

The Court will enter an order consistent with this Memorandum Opinion.

### ORDER

The Court has considered the parties cross motions for summary judgment. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment as to liability on the grounds that AIG lacked a "permissible purpose" when it obtained her credit report, is DENIED. Counts I and II are retained pending resolution of other issues, including those discussed in the Memorandum Opinion.

IT IS FURTHER ORDERED that Defendants' motions for summary judgment are SUSTAINED IN PART and Count III is DISMISSED WITH PREJUDICE and Counts IV, V, VI, VII and IX are DISMISSED WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that Defendants' motion for summary judgment is DENIED as to Counts VIII and X.