James J. TRIKAS, pro se, Plaintiff,

v.

UNIVERSAL CARD SERVICES CORP. (UCS) aka Universal Bank N.A. aka AT & T Universal Card, subsidiary of Citibank, member of Citigroup, Defendant.

No. 01–CV–3287 (DLI).

United States District Court, E.D. New York.

Jan. 3, 2005.

James J. Trikas, Flushing, NY, pro se.

Christine B. Cesare, Robert R. Reed, Robin Kitzes Silk, Bryan Cave LLP, New York City, Timothy P. Creech, Satzberg Trichon Kogan & Wertheimer PC, Philadelphia, PA, for Defendant.

## *OPINION AND ORDER*

IRIZARRY, District Judge.

Plaintiff in this action, appearing pro se, alleges violations of the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 et seq., based on the failure of a credit card company, defendant Universal Card Services Corp.[1] ("Bank"), to report his account as closed to various consumer reporting agencies. Plaintiff also lists state law claims for violations of N.Y. Gen. Bus. L. §§ 349 (consumer protection statute prohibiting deceptive acts or practices) and 380 et seq. (the state equivalent of the FCRA) and breach of privacy promise. For the reasons set forth below, the Bank's motion for summary judgment is granted in its entirety, and the complaint is dismissed without costs to either party.

## I. FACTS

### A. *Background*

Plaintiff opened a credit card account with the Bank in April 1994, and his last card expired in May 1999. The Bank's internal customer service records show that Plaintiff's card was declined for reissue in April 1999 and that Plaintiff contacted the Bank by telephone on June 10, 1999 to inquire about the expiration of his card. (Pl.'s Exs. B, B1.) The Bank informed Plaintiff during this phone call that reissue had been declined due to inactivity. Plaintiff called the Bank again a week later, on June 17, 1999, as well as several more times in August 1999 to inquire about his card not being reissued. (Pl.'s Exs. B2, B3, D, D1.) By letter dated August 7, 1999, the Bank explained to Plaintiff that his account was declined for reissue because of inactivity in the previous year and, consequently, closed. (Pl.'s Ex. E.)

However, Plaintiff's account continued to be reported as "open" on several consumer reporting agency credit reports: (1) a Privacy Guard report dated August 9, 2000 listed Plaintiff's account with the Bank as "pays as agreed" for 4/00 or 5/00, according to three credit bureaus; (2) an Experian report dated August 15, 2000 listed Plaintiff's account as "open/never late"[2] and listed monthly balances at "0" for June 1999 through April 2000; and (3) a Trans Union report dated August 17, 2000 listed Plaintiff's account as "paid or paying as agreed in prior 24 months from date paid[;] never late," without giving any indication that the account was closed. (Pl.'s Ex. N.)

In addition to the inaccurate reporting of his account as open, Plaintiff complains of several inquiries made by the Bank, occurring after his account was supposedly closed, that appear on the credit reports: the Experian report shows an inquiry made in July 2000, which the Privacy

---

**1.** Plaintiff's complaint incorrectly identifies the Defendant as "Universal Card Services Corp." The actual defendant is Citibank, successor in interest to Universal Bank, N.A., which issued the AT & T Universal Card to Plaintiff that is at issue in this lawsuit.

**2.** The Experian report also contains the following note under the "Comments" section where it lists Plaintiff's account with the Bank: "Your Statement: 'account closed by consumer[']s request.'"

Guard report also lists for Experian, and the Trans Union report shows inquiries for 6/1999, 8/1999, 10/1999, 12/1999, 2/2000, 3/2000, and 7/2000.[3]

The Bank's records show a call received from Plaintiff regarding these inquiries on August 9, 1999. (Pl.'s Ex. D1.) In response, the Bank sent a letter to Plaintiff on August 9, 1999 to address his concerns and to inform him that "the only the inquiries visible to creditors are the ones initiated by you when you apply for credit." (Pl.'s Ex. F.) On August 11 and 12, 1999, Plaintiff called the Bank again, requesting an explanation as to what permissible purpose the Bank would have with his credit report. (Pl.'s Exs. G, G1.) Although the Bank's records of Plaintiff's subsequent calls, if any, are unclear, the Bank sent Plaintiff a letter on August 16, 2000 to inform him that his account had been cancelled. (Pl.'s Ex. O.)

### B. Actions Taken by Bank After Receiving a Consumer Dispute Verification

The Bank's records show that it received a consumer dispute verification (CDV) from Experian on or around August 24, 2000.[4] (Def.'s Ex. 2.) The Bank received two more CDVs: one from Trans Union on September 8, 2000 and one from Equifax on September 15, 2000. (Id.)

The Bank sent Plaintiff another letter on September 2, 2000, reporting that his account was "close[d] due to nonusage for at least a year" and yet another letter on September 11, 2000 to explain to Plaintiff the closed status of his account. (Pl.'s Exs. P, Q.)

The Bank sent three more letters to Plaintiff, also to explain that his account had been closed, on September 30, 2000, October 5, 2000, and October 25, 2000—the last two assuring Plaintiff that "the major credit reporting agencies ... have been notified ... to show this account as 'closed by consumer.'" (Pl.'s Exs. R, S, T.)

### II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court must view all facts in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). However, the nonmoving party "may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 101 (2d Cir.1997) (internal quotation marks omitted). Furthermore, "the

---

**3.** The Experian report lists its sole inquiry under "Other requests .... We offer credit information about you to those with a permissible purpose, for example, to: other creditors who want to offer you preapproved credit ... your current creditors to monitor your accounts (date listed may reflect only the most recent request)." The Trans Union report contains the following notation to the inquiries: "The following companies obtained information from your consumer report for the purpose of an account review or other business transaction with you. These inquiries are not displayed to anyone but you and will never affect any credit decision."

**4.** The record for August 24, 2000 contains the following notation: "ACDV FRM XPRN 8/21:DSP CLSD;RTN CLSD CM," indicating that the CDV may have been sent on August 21.

mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505.

## III. CLAIMS UNDER THE FAIR CREDIT REPORTING ACT

The purpose of the FCRA is to ensure "that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. § 1681(b). In addition to regulating the conduct of credit reporting agencies, the FCRA protects consumers from any "person" who obtains a consumer report for an impermissible purpose. 15 U.S.C. § 1681b(f).[5] Furnishers of information under the FCRA also have a duty to provide accurate information and must correct inaccuracies when notified by a consumer reporting agency. 15 U.S.C. § 1681s–2.

The FCRA establishes civil liability for both willful and negligent noncompliance with the statute. 15 U.S.C. §§ 1681n– 1681o. The FCRA also contains a provision setting forth criminal liability for "knowingly and willfully obtain[ing] information ... under false pretenses." 15 U.S.C. § 1681q. Following amendments in 1996, section 1681n now incorporates similar language that assigns civil liability: "Any person who obtains a consumer re-

port from a consumer reporting agency under false pretenses or knowingly without a permissible purpose shall be liable to the consumer reporting agency for actual damages sustained by the consumer reporting agency or $1,000, whichever is greater." 15 U.S.C. § 1681n(b); *see also Phillips v. Grendahl,* 312 F.3d 357, 363–64 (8th Cir.2002) (providing a brief history of the courts' interpretation of § 1681q and civil liability and the significance of the 1996 amendments).

### A. *Claims Under § 1681b(f)*

Section 1681b sets forth the permissible purposes by which a credit reporting agency may issue consumer reports, including to a "person" the reporting agency has reason to believe "intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer." 15 U.S.C. § 1681b(a)(3)(A). Subsection (f) extends liability to any "person" that obtains a consumer report for a purpose other than those permitted under § 1681b. Section § 1681b(f) also requires that the purpose be "certified in accordance with section 1681e of this title by a prospective user of the report through a general or specific certification." Plaintiff contends that the Bank (a "person") acted with an impermissible purpose when it made inquiries into his credit history several times from June 1999 through July 2000, because, as his account should have been closed, he was not a customer of the Bank.[6]

---

5. "Person" refers to "any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity." 15 U.S.C. § 1681a(b).

6. It is undisputed that the Bank declined to reissue Plaintiff's card and that he was never reissued a new card after it expired in May 1999.

However, Plaintiff's argument overlooks the plain language of the statute, which focuses on the *intent* of the party obtaining the consumer report.[7] *See Scharpf v. AIG Marketing, Inc.*, 242 F.Supp.2d 455, 459 (W.D.Ky.2003). Indeed, the inclusion of the verb "intends" is significant, because "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Id.* at 460 (quoting *Duncan v. Walker*, 533 U.S. 167, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001)).

Although Plaintiff's account should have been closed, it remained open. The Bank explains that this error was caused by its failure to properly code the Plaintiff's account as "closed." (Def.'s Mem. at 4; Def.'s Resp. to Interrogs. at 2–3.) In its response to Plaintiff's interrogatories, the Bank explains: "To the extent the Bank's computerized records reflected Plaintiff's account as opened, Plaintiff's account would have been included in such periodic requests." (Def.'s Resp. to Interrogs. at 2–4.) Plaintiff does not put forth any evidence to contradict this purpose.

Though there is no case law in this Circuit involving similar facts, a Louisiana district court in *Kennedy v. Victoria's Secret Stores, Inc.* examined a situation where a credit card company obtained the consumer report of an individual whom it mistakenly believed to be a customer. 2004 WL 2186613 (E.D.La.). In *Kennedy*, the plaintiff claimed that, after making a purchase with an American Express card at a Victoria's Secret store, the salesperson used her information—without her permission—to open a Victoria's Secret credit card account. *Id.* at *1. The court granted judgment on the pleadings in favor of the defendant, finding that Victoria's Secret obtained the plaintiff's consumer report *"for the purposes of* using the information to extend credit or to review or collect on an account," which is permissible under § 1681b(a)(3)(A). *Id.* at *3 (emphasis added).

Here, the Bank did not "surreptitiously" initiate a customer relationship with the Plaintiff as was the case in *Kennedy*. *See id.* at *1. Rather, at least for some time, the Bank had a business relationship with the Plaintiff. Just as Victoria's Secret *intended* to use the consumer report of the plaintiff in *Kennedy* "to extend credit or to review or collect on an account," the intention behind the Bank's periodic requests for Plaintiff's consumer report was merely to review his account, albeit an account that should have been closed.

Furthermore, the instant case is very different from cases where courts have found purposes to be impermissible based on the intent of the defendant. *See, e.g., Phillips v. Grendahl*, 312 F.3d 357, 367–68 (8th Cir.2002) (finding purpose impermissible where woman obtained her prospective son-in-law's consumer report in order to investigate him); *Rodgers v. McCullough*, 296 F.Supp.2d 895, 898, 901 (W.D.Tenn.2003) (finding purpose impermissible where attorney obtained a consumer report on her client's adversary in a child custody case, where there was no outstanding judgment or debt); *Thibodeaux v. Rupers*, 196 F.Supp.2d 585, 586, 591–92 (S.D.Ohio 2001) (finding purpose impermissible where defendant obtained a consumer report on his sister's es-

---

**7.** A consumer reporting agency may issue consumer reports to any person "it has reason to believe ... *intends* to use the information in connection with a credit transaction ... involving the extension of credit to ... or *review* or collection of an account of, the consumer." § 1681b(a)(3)(A). Under § 1681b(f), this language extends this permissible purpose to *persons*.

tranged husband to investigate his finances). The Bank did not plot or plan to obtain Plaintiff's credit report for any ostensibly impermissible purpose; it was simply retained in error. Any inquiries into Plaintiff's consumer report occurred under the Bank's intent to review an existing customer's account, even though Plaintiff was no longer the Bank's customer.

Plaintiff urges the court to consider several informal staff opinion letters issued by the Federal Trade Commission in support of his position that a credit card issuer may not obtain the consumer reports of its former customers. As one letter explains, for former customers, "there no longer exists any account to 'review' and [if] the consumer is not applying for credit, the FCRA provides no permissible purpose for the creditor to receive a consumer report." FTC Informal Staff Opinion Letter, Kenneth J. Benner (Apr. 30, 1999) (Pl.'s Ex. 1). However, this letter refers to another letter for more detail, FTC Informal Staff Opinion Letter, Don Gowen (Apr. 29, 1999), which discusses the limitations of creditors to market credit to former borrowers. (Pl.'s Ex. 2.) Tellingly, the intent of the creditor in such a situation would not be to review an account, as would be the case in an account remaining open in error, but to solicit business. Moreover, these informal administrative opinion letters are not binding on the court. In *Christensen v. Harris County*, the Supreme Court held that "[i]nterpretations such as those in opinion letters ... do not

warrant *Chevron*-style deference."[8] 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). Rather, "interpretations contained in formats such as opinion letters are 'entitled to respect' ... but only to the extent that they are persuasive." *Id.* (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). As the facts cited in these letters are not similar enough to the Bank's actions, the court declines to find them persuasive.

Regarding certification under § 1681e, the second requirement under § 1681b(f), Plaintiff does not seem to allege that there was an absence of certification, nor does Plaintiff provide any evidence that certification did not occur. Finding the Bank's purpose otherwise permissible, the court will not allow Plaintiff to survive summary judgement with conclusory statements that § 1681e was violated.[9]

Although the Bank's inquiries into Plaintiff's consumer report were made in error, the court finds that they were not made with an impermissible purpose. Accordingly, Plaintiff's claim under § 1681b is dismissed.

### B. *Claims Under § 1681q*

Plaintiff also claims that the Bank obtained his credit report "under false pretenses" in violation of § 1681q, which imposes criminal liability. However, since the court finds that the Bank did not act with an impermissible purpose, this precludes liability under § 1681q as a matter of law. *See Edge v. Professional Claims*

---

**8.** In *Chevron*, the Supreme Court held that "a court must give effect to an agency's regulation containing a reasonable interpretation of an ambiguous statute." *Christensen*, 529 U.S. at 586–87, 120 S.Ct. 1655 (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

**9.** Plaintiff also added § 1681e separately to his laundry list of claims but provided little or no detail as to this claim. Section 1681e mostly applies to consumer reporting agencies and "procurers [of consumer reports] for resale," so the only question involving the Bank would be whether certification under § 1681e was obtained in compliance with § 1681b(f).

*Bureau, Inc.,* 64 F.Supp.2d 115, 117 (E.D.N.Y.1999).

### C.  *Claims Under § 1681s–2*

Plaintiff does not specify whether he alleges violation of subsection (a) or (b) of § 1681s–2, but the court will address both.

■ First, there is no private right of action under section 1681s–2(a), which requires "furnishers of information" to provide accurate information to consumer reporting agencies. *See Elmore v. North Fork Bancorporation, Inc.,* 325 F.Supp.2d 336, 339 (S.D.N.Y.2004). Therefore, any claim made under this section fails.

■ Section 1681s–2(b), on the other hand, addresses the duties of furnishers of information that receive notice of "a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency." Under this subsection, furnishers of information—after receiving notice of a dispute from a consumer reporting agency—must review information provided by the consumer reporting agency, investigate, and report any inaccuracies to all consumer reporting agencies to which the furnishers provide information. 15 U.S.C. § 1681s–2(b)(1). The deadline for completing the investigation, review, and report of any corrected information is thirty days from receiving notice. § 1681s–2(b)(2).

The Bank's records show that it received a consumer dispute verification (CDV) from three consumer reporting agencies: (1) from Experian on or around August 24, 2000, (2) from Trans Union on September 8, 2000, and (3) from Equifax on September 15, 2000. (Def.'s Ex. 2.) Because the Bank's records contain many codes and abbreviations, it is unclear what specific action the Bank took after receiving each of these notices. However, the Bank concluded its investigation by sending a "Universal Data Form" to Experian, Equifax, and Trans Union on October 24, 2000—two months after the first CDV—to report that Plaintiff's account was closed as of April 1999. (Def.'s Ex. 2.) Although the Bank may have started its investigation of the CDV on August 24 or shortly thereafter,[10] § 1681s–2(b)(2) is clear that "[a] person shall *complete* all investigations, reviews, and reports" by the end of the thirty day period (emphasis added). The Bank, therefore, did not comply with its duties as a furnisher of information under this section.

### D.  *Damages*

■ Although the court finds that the Bank violated § 1681s–2(b), summary judgment is still appropriate if no reasonable factfinder could find that Plaintiff is entitled to damages under the FCRA. Plaintiff asserts that he is entitled to damages under both § 1681n and § 1681o for willful and negligent noncompliance, respectively.

Section § 1681n provides for actual and punitive damages, as well as attorney's fees, for willful violations of the FCRA. Plaintiff has put forth no evidence to support a finding of willfulness or to contradict the Bank's explanation that it had coded his account incorrectly, and, on a motion for summary judgment, the nonmovant cannot rely on "conclusory allegations." *Podell,* 112 F.3d at 101. Even before the Bank was required to take any action, i.e., before the receipt of any CDVs concerning the erroneous report of Plain-

---

**10.** The Bank's customer service records contain several notations indicating that it took action in response to the CDV, for example: (1) "investigation referral" recorded on August 31, 2000 and September 6, 2000, (2) "investigation referral printed" recorded on September 1, 2000, and (3) "sent mgr refferal [sic] to h[a]ve bureau corrected" recorded on September 6, 2000.

tiff's account as "open," the Bank sent several letters to Plaintiff to address his concerns. Furthermore, the Bank initiated its investigation almost immediately after receiving the CDVs.[11] The Bank did not move quickly enough, but this sole fact is insufficient for surviving summary judgment as to willfulness. *See Philbin v. Trans Union Corp.,* 101 F.3d 957, 970 (3d Cir.1996) (plaintiff's allegation that Trans Union failed to correct an error on his credit report, despite being notified, "f[ell] short of evidence of a willful violation"). Indeed, the Second Circuit has stated: "The summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985).

Negligent violations of the FCRA entitle a plaintiff to collect actual damages and attorney's fees. 15 U.S.C. § 1681o. Here too, however, Plaintiff has not presented sufficient evidence of damages to survive summary judgment. Plaintiff testified that he was never turned down for any credit because of the Bank's actions, and that he never even applied for any credit during the time his account remained erroneously open.[12] (Trikas Dep. at 248–49.) Plaintiff admits that he has not suffered monetary damages: "It's not a value that I suffered monetarily, as you could say it, a dollar value, because this is, like I said, it's emotional, it's stress, it's burden." (*Id.* at 254.)

■ " '[A]ctual damages' may include humiliation and mental distress, even in the absence of out-of-pocket expenses,"

but claiming private mental distress, without any showing that a creditor or other third party saw the erroneous information or took any negative action towards the allegedly aggrieved party because of it, is not enough for pain and suffering damages. *Casella,* 56 F.3d at 474–75. Plaintiff does not allege that third parties were aware of the open status of his account or that they took adverse action against him. Consumer reporting agencies and the Bank all explained that the inquiries on his consumer report would only be viewed by him, would not be visible to creditors, and would not affect any credit decisions. Finally, even if a third party had seen Plaintiff's account with the Bank reported erroneously as open, there was no negative information to see: Experian listed "potentially negative items ... 0," Trans Union reported the status of Plaintiff's card as "paid or paying as agreed ... never late," and all consumer reports listed Plaintiff's balance at zero.

■ Attorney's fees are likewise unavailable to Plaintiff because he has represented himself in this action. *See McCauley v. Trans Union LLC,* 2003 WL 22845741, at *2 n. 4 (S.D.N.Y.2003) (citing *Hawkins v. 1115 Legal Svc. Care,* 163 F.3d 684, 694–95 (2d Cir.1998)).

As Plaintiff has not put forth any evidence of damages available under the FCRA, his claims under §§ 1681s–2, 1681n, and 1681o are dismissed.

## IV. STATE LAW CLAIMS

The court also finds without merit Plaintiff's claims for violation of N.Y. Gen. Bus.

---

11. *See supra* n. 10 (description of the various actions that the Bank took in response to the CDVs).

12. Even a claim of lost opportunity, i.e., that an individual did not apply for new credit for

fear of being rejected, is "too speculative" to establish actual damages. *Casella v. Equifax Credit Info. Services,* 56 F.3d 469, 475 (2d Cir.1995).

L. §§ 349 and 380 et seq. and breach of privacy promise.

■ Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." "To prevail on a § 349 claim, a plaintiff must show that '(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result.'" *Boule v. Hutton*, 320 F.Supp.2d 132, 136–37 (S.D.N.Y.2004) (quoting *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000)). Because Plaintiff has failed to prove any harm, which precluded any recovery for negligent violation of the FCRA, this claim must also be dismissed. *See Podell v. Citicorp Diners Club, Inc.*, 914 F.Supp. 1025, 1035–36 & n. 3 (S.D.N.Y. 1996), *aff'd*, 112 F.3d 98 (2d Cir.1997) (failure to show negligence defeats § 349 claim). Additionally, Plaintiff has failed to adduce any evidence of wilfulness, and it cannot be said that the Bank has engaged in "materially misleading or deceptive acts." *See Obabueki v. Int'l Bus. Machs. Corp.*, 145 F.Supp.2d 371, 400 (S.D.N.Y. 2001).

The New York Fair Credit Reporting Act is contained in § 380 et seq. of the New York General Business Law. Since courts interpret the FCRA and related New York statute similarly, the points already discussed also warrant granting the Bank's summary judgment motion as to Plaintiff's state FCRA claims. *See Ali v. Vikar Mgmt. Ltd.*, 994 F.Supp. 492, 498 (S.D.N.Y.1998).

Plaintiff's last allegation is "breach of privacy promise," which apparently refers to a printout of a "Privacy Promise" that Plaintiff attached to his complaint. The Privacy Promise, allegedly posted on an AT & T / Universal Card Services Corp. website, was printed on May 22, 2001.

■ To establish a breach of contract in New York, Plaintiff must show "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir.1994). The court dismisses this claim as a matter of law, because Plaintiff has failed to allege any contract damages. Under New York law, punitive or mental distress / emotional damages, which are the only damages Plaintiff alleges, are not available for a breach of contract claim. *See, e.g., Egan v. New York Care Plus Ins. Co. Inc.*, 277 A.D.2d 652, 716 N.Y.S.2d 430, 432 (3d Dep't 2000); *Dana v. Oak Park Marina, Inc.*, 230 A.D.2d 204, 660 N.Y.S.2d 906, 911–12 (4th Dep't 1997). The court need not address in this case whether the Privacy Promise constitutes a contract, but "broad statements of company policy do not generally give rise to contract claims." *Dyer v. Northwest Airlines Corps.*, 334 F.Supp.2d 1196, 1200 (D.N.D.2004) (finding that alleged violation of airline's web-posted privacy policy "d[id] not give rise to a contract claim").

Summary judgment is granted to the Bank as to all of Plaintiff's state law claims.

## V. CONCLUSION

For the foregoing reasons, the Bank's motion for summary judgment is granted in its entirety, and the complaint is dismissed without costs to either party.

SO ORDERED.