**Douglas ASHBY, Carol Porto, and Grant Wenzlick, Plaintiffs,**

v.

**FARMERS GROUP, INC., Defendant.**

**No. CV 01–1446–BR.**

United States District Court, D. Oregon.

Feb. 20, 2003.

N. Robert Stoll, Steven D. Larson, Steven C. Berman, Stoll Stoll Berne Lokting & Schlachter, P.C., Portland, Charles A. Ringo, Beaverton, OR, for Plaintiffs.

Barnes H. Ellis, Scott E. Crawford, Stoel Rives, LLP, Portland, OR, for Defendant.

## OPINION AND ORDER

BROWN, District Judge.

This matter comes before the Court on Defendant's Motion for Summary Judgment on Grounds that FGI, A Non–Carrier, Has Taken No Adverse Action (# 51).

The Court heard oral argument on Defendant's Motion on November 22, 2002. Plaintiffs' Motion for Class Certification (# 45) also is pending.

Plaintiffs Douglas Ashby, Carol Porto, and Grant Wenzlick seek to bring a class action on behalf of individuals who purchased personal lines of insurance from subsidiaries of Defendant Farmers Group, Inc. (FGI), from October 1999 to the present. According to Plaintiffs, FGI used information taken from consumer credit reports when it allegedly underwrote insurance policies, FGI took adverse action against Plaintiffs and others based on such information, and FGI subsequently failed to provide notice of the adverse action as required by the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681, *et seq.* Plaintiffs seek statutory damages, punitive damages, and attorneys' fees.

For the reasons that follow, the Court finds FGI has shown it did not "take" adverse action against Plaintiffs, and FGI, therefore, is entitled to summary judgment on Plaintiffs' claims as a matter of law. Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment (# 51). As a result, the Court need not address Plaintiffs' Motion for Class Certification (# 45) and *DENIES* Plaintiffs' Motion as moot.

## BACKGROUND

This is FGI's second Motion for Summary Judgment. On February 28, 2002, the Court denied FGI's first Motion for Summary Judgment. The Court noted 15 U.S.C. § 1681m requires a person or entity that takes an adverse action based in whole or in part on information in a consumer credit report to give notice of the adverse action to the consumer. The Court concluded the written notice that FGI provided to Plaintiff Ashby did not meet that standard.

FGI now moves for summary judgment on the ground that it did not violate § 1681m(a) because it "could not and did not take any adverse action" against Plaintiffs. FGI contends it merely acted in its capacity as attorney-in-fact (AIF) for Farmers Insurance Company of Oregon (FICO), the entity that actually insured Plaintiffs. According to FGI, only a certified insurance carrier is capable of taking adverse action against policyholders within the meaning of FCRA. FGI asserts, therefore, it could not take any adverse actions as defined by FCRA when it acted as AIF for FICO.[1]

## STANDARDS

### 1. Summary Judgment

Fed.R.Civ.P. 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show the absence of an issue of material fact. *Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 919 (9th Cir.2001). In response to a properly-supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine issue of material fact for trial. Fed.R.Civ.P. 56(e).

An issue of fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Guidroz–Brault v. Mo. Pac. R.R. Co.,* 254 F.3d 825, 829 (9th Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d

---

1. During oral argument in a related case, Plaintiffs' counsel clarified Plaintiffs in this matter assert only that FGI is a direct statutory "taker" of adverse action. Indeed, Plaintiffs do not plead the theories of alter ego or representative, derivative, or vicarious liability. *See Sams v. Geico,* CV 01–1458–BR (J. Brown)(Tr. of Hearing, Jan. 6, 2003, at 6–7).

202 (1986)). The Court must draw all reasonable inferences in favor of the nonmoving party. *Hensley v. Northwest Permanente P.C. Ret. Plan & Trust,* 258 F.3d 986, 999 (9th Cir.2001), *cert. denied,* 534 U.S. 1082, 122 S.Ct. 815, 151 L.Ed.2d 699 (2002). A mere disagreement about a material issue of fact, however, does not preclude summary judgment. *Jackson v. Bank of Haw.,* 902 F.2d 1385, 1389 (9th Cir.1990). When the nonmoving party's claims are factually implausible, that party must come forward with more persuasive evidence than otherwise would be required. *Blue Ridge Ins. Co. v. Stanewich,* 142 F.3d 1145, 1147 (9th Cir.1998) (citation omitted).

The substantive law governing a claim or a defense determines whether a fact is material. *Addisu v. Fred Meyer, Inc.,* 198 F.3d 1130, 1134 (9th Cir.2000). If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment. *Arpin,* 261 F.3d at 919.

## 2. Statutory Construction

When a district court interprets a federal statute, it must apply a two-part analysis. "The first and most important step in construing a statute is the statutory language itself." *Royal Foods Co. v. RJR Holdings, Inc.,* 252 F.3d 1102, 1106 (9th Cir.2001) (citing *Chevron USA v. Natural Res. Def. Council,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). The court must look to the text of the statute to " 'determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.' " *Id.* (quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)).

"The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *Food and Drug Admin. v. Brown & Williamson Tobacco*

*Corp.,* 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). Accordingly, it is a " 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.' " *Id.* at 133, 120 S.Ct. 1291 (quoting *Davis v. Michigan Dep't of Treasury,* 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989)). A court, therefore, must "interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole." *Food and Drug Admin.,* 529 U.S. at 133, 120 S.Ct. 1291 (internal quotations and citations omitted).

If the congressional intent is clear from the plain meaning of the statute, the court need not look any further for guidance. *Id.* If the statute is ambiguous, however, the court must proceed to the second step and determine the meaning of the statutory language by giving deference to the governing agency's interpretation as long as that interpretation is permissible. *Id.* at 132, 120 S.Ct. 1291. If there is no agency interpretation and the text of the statute is ambiguous, the court may look to legislative history as an aid to discern congressional intent. *In re Bankr. Estate of MarkAir, Inc.,* 308 F.3d 1038, 1043 (9th Cir.2002).

## FCRA

When Congress enacted FCRA, it required consumer credit reporting agencies to adopt procedures for meeting the needs of business in a manner both fair and equitable to the consumer. *See* 15 U.S.C. § 1681(b). The purpose of FCRA is to protect consumers from the transmission of inaccurate information about them. *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir.1995).

Under FCRA, a consumer reporting agency may furnish consumer reports:

(3) To a person which it has reason to believe—

(A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer; or

(B) intends to use the information for employment purposes; or

(C) intends to use the information in connection with the underwriting of insurance involving the consumer; or

(D) intends to use the information in connection with a determination of the consumer's eligibility for a license or other benefit granted by a governmental instrumentality required by law to consider an applicant's financial responsibility or status; or

(E) intends to use the information, as a potential investor or servicer, or current insurer, in connection with a valuation of, or an assessment of the credit or prepayment risks associated with, an existing credit obligation; or

(F) otherwise has a legitimate business need for the information—

(i) in connection with a business transaction that is initiated by the consumer; or

(ii) to review an account to determine whether the consumer continues to meet the terms of the account.

15 U.S.C. § 1681(b)(a)(3).

In addition to governing the conduct of consumer reporting agencies, FCRA requires any person that takes an "adverse action" based on information provided by consumer reporting agencies to satisfy certain responsibilities. 15 U.S.C. § 1681m(a) provides:

If any person takes any adverse action with respect to any consumer that is based in whole or in part on any infor-mation contained in a consumer report, the person shall—

(1) provide oral, written, or electronic notice of the adverse action to the consumer;

(2) provide to the consumer orally, in writing, or electronically—

(A) the name, address, and telephone number of the consumer reporting agency ... that furnished the report to the person; and

(B) a statement that the consumer reporting agency did not make the decision to take the adverse action and is unable to provide the consumer the specific reasons why the adverse action was taken; and

(3) provide to the consumer an oral, written, or electronic notice of the consumer's right—

(A) to obtain ... a free copy of a consumer report on the consumer from the consumer reporting agency ... which notice shall include an indication of the 60–day period under that section for obtaining such a copy; and

(B) to dispute ... with a consumer reporting agency the accuracy or completeness of any information in a consumer report furnished by the agency.

Similarly, a person or entity that takes an adverse action against a consumer based on certain information provided by an entity related by common ownership or affiliated by common corporate control also has certain obligations under FCRA. *See* 15 U.S.C. § 1681m(b)(2).

In connection with insurance, FCRA defines an "adverse action" to include:

(i) a denial or cancellation of, an increase in any charge for, or a reduction or other adverse or unfavorable change in the terms of coverage or amount of, any insurance, existing or applied for, in

connection with the underwriting of insurance . . . .

15 U.S.C. § 1681a(k)(1)(B)(i).

In *Razilov v. Nationwide Mut. Ins. Co.*, this Court recently examined and construed the meaning of "takes" as used in § 1681m(a). *See* No. CV 01–1466–BR, 2003 WL 245706 (D.Or. Jan.21, 2003). This Court found the dictionary definition, "to undertake and make, do, or perform . . . ([take] legal action)," consistent with the text of § 1681m(a) and the statutory scheme as a whole. *Id.* at *11. This Court also reasoned the plain language of the statute requires an active definition of "takes": "a person 'takes' an adverse action in connection with insurance when the person denies, cancels, increases in price, or reduces or changes adversely the terms or amounts of insurance based on information in a consumer credit report." *Id.*, at *10. Thus, this Court found an internal decision-making process is insufficient to trigger the notice requirement under § 1681m(a). *Id.* (citing analogous reasoning in *Obabueki v. Int'l Bus. Machs. Corp.*, 145 F.Supp.2d 371 (S.D.N.Y.2001), *aff'd*, No. 02–7499, 2003 WL 220411 (2d Cir. Feb.3, 2003)). Accordingly, this Court concluded the duty to give the notice required under § 1681m(a) is not triggered by establishing a decision-making process; providing information; and setting policies, guidelines, and standards that lead to the taking of an adverse action. *Razilov*, 2003 WL 245706, at *14.

## FACTS

These facts are taken from the parties' Statements of Fact and are undisputed except as noted. In addition, the Court includes certain undisputed facts acknowledged by the parties in the course of oral argument.

Each of the three Plaintiffs purchased insurance policies that identified FICO as the insuring company. FICO is a domestic stock insurer authorized to conduct the business of insurance in Oregon. FICO is owned by other Farmers insuring entities known as reciprocal exchanges (the Exchanges). Neither FICO nor the Exchanges are parties to this action.

The Defendant, FGI, is a Nevada stock corporation that provides management services. FGI is not authorized to underwrite insurance policies and does not own any interest in the Exchanges or FICO. The parties agree FGI acts as an AIF when it provides its management services to all of the Farmers insuring entities, including FICO. *See* Pls.' Separate Facts at ¶ 8; Pl. Resp. Memo. at 1; Def.'s Reply Facts at ¶ 8. An AIF is a creation of state insurance codes. For example, a "reciprocal" insurer, such as one of the Exchanges, is "an unincorporated aggregation of persons known as 'subscribers,' operating individually and collectively through an attorney in fact common to all such persons, interexchanging among themselves reciprocal agreements of indemnity." Or.Rev. Stat. § 731.142(3). In addition, an AIF has rights and authority as granted by subscribers in the power of attorney. Or. Rev.Stat. § 731.466(1). In this case, the parties acknowledge FGI's role as an AIF is the functional equivalent of an agent for FICO. *See* FGI's Reply Memo. at 2; Tr. 30, Hearing on Nov. 22, 2002.

When one of the Exchanges contracts to provide insurance to an individual, the policyholder enters into a subscription agreement with FGI or one of its subsidiaries and designates FGI or one of its subsidiaries as AIF. When FICO directly contracts to provide insurance to an individual, however, a subscription agreement appointing an AIF is not required. None of the Plaintiffs' policies in this case, however, were issued by the Exchanges.

The management services FGI provides to both the Exchanges and to FICO relat-

ing to the sale and issuance of insurance policies, include: setting rate structures for policies, reviewing applications for insurance, performing functions related to underwriting, setting policy terms, physically issuing the policies, mailing invoices, and collecting premiums. Portions of the premiums are applied to FGI's management fees, claims, administration, loss adjustment, and expenses. The remaining amounts are credited to the insuring entity's surplus account.

FGI began a program in 1999 using "risk assessment scores" to determine and to set the rates charged for automobile insurance. FGI has used risk assessment scores since 2000 for both automobile and homeowners insurance policies. As part of its program, FGI contracts with TransUnion to obtain consumer credit information.

Sales agents, acting as independent contractors, sell "Farmers" insurance policies to consumers. When a customer applies for insurance with a Farmers insuring entity or when a Farmers insuring entity renews an existing customer's policy, an agent enters the customer's information into a centralized computer system that FGI owns and operates. FGI then requests the customer's credit information from TransUnion. TransUnion inputs the customer's credit information into a software program that produces a numerical score. FGI's computer program then applies an internal rating standard and converts the numerical score provided by the credit reporting agencies to a letter designation. The rate charged to the policyholder is based, in part, on FGI's letter designation. If FGI determines an adverse action has been taken against an existing or potential policyholder based on the credit information, FGI sends a document titled "Fair Credit Reporting Act Notification" to the customer.

According to FGI, only FICO issued Plaintiffs' policies and quoted and fixed Plaintiffs' premiums. Although Plaintiffs admit FICO is the insuring company listed on their policies, they contest FGI's assertions that it did not "issue" the policies or quote or fix the premiums.

Plaintiff Wenzlick has had a renter's insurance policy with FICO since 1993. Wenzlick did not receive the lowest rate (or largest discount) for his insurance because of his credit score. Plaintiff Porto has had automobile and homeowners policies with FICO since 1985. Porto also did not receive the lowest rate (or largest discount) for her insurance because of her credit score. Plaintiff Ashby had an insurance policy with FICO that took effect in 2001. Ashby also did not receive the most favorable premium for his insurance because of his credit score.

## DISCUSSION

### I. FGI did not "take" any adverse action as an "insurer."

FGI, a management services company, seeks summary judgment because "it could not and did not take any adverse action" against Plaintiffs. FGI argues only a certified insurance carrier is capable of "taking" any "adverse action" as defined in FCRA.

As noted, § 1681m(a) requires notice and disclosure "[i]f any person takes any adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report ...." In connection with insurance, "adverse action" includes "a denial or cancellation of, an increase in any charge for, or a reduction or other adverse or unfavorable change in the terms of coverage or amount of, any insurance ...." 15 U.S.C. § 1681a(k)(1)(B)(i). According to FGI, one must be an "insurer" as defined under the Oregon Insurance Code to be capable of taking an "adverse action" under FCRA concerning an insurance policy issued in

Oregon because only an "insurer" is capable of denying, cancelling, increasing, reducing or changing the terms of coverage. Indeed, Or.Rev.Stat. § 731.354 provides: "No person shall act as an insurer and no insurer shall directly or indirectly transact insurance in this state except as authorized . . . ."

FGI emphasizes it is not an authorized "insurer." Under Oregon law, an "insurer" is "every person engaged in the business of entering into policies of insurance." Or.Rev.Stat. § 731.106. A "policy" is "the written contract or written agreement for or effecting insurance . . . ." Or.Rev.Stat. § 731.122. "Insurance" is defined as "a contract whereby one undertakes to indemnify another or pay or allow a specified or ascertainable amount or benefit upon determinable risk contingencies." Or.Rev.Stat. § 731.102(1).

■ FGI argues it cannot "transact insurance" under the Oregon Insurance Code because it is not licensed as an "insurer." Or.Rev.Stat. § 731.146(1) provides:

"Transact insurance" means one or more of the following acts effected by mail or otherwise:

(a) Making or proposing to make an insurance contract.

(b) Taking or receiving any application for insurance.

(c) Receiving or collecting any premium, commission, membership fee, assessment, due or other consideration for any insurance or any part thereof.

(d) Issuing or delivering policies of insurance.

(e) Directly or indirectly acting as an agent for, or otherwise representing or aiding on behalf of another, any person in the solicitation, negotiation, procurement or effectuation of insurance or renewals thereof, the dissemination of information as to the coverage or rates, the forwarding of applications, the delivering of policies, the inspection of risks, the fixing of rates, the investigation or adjustment of claims or losses, the transaction of matters subsequent to effectuation of the policy and arising out of it, or in any other manner representing or assisting a person with respect to insurance.

(f) Advertising locally or circulating therein without regard for the source of such circulation, whenever such advertising or circulation is for the purpose of solicitation of insurance business.

(g) Doing any other kind of business specifically recognized as constituting the doing of an insurance business within the meaning of the Insurance Code.

(h) Doing or proposing to do any insurance business in substance equivalent to any of paragraphs (a) to (g) of this subsection in a manner designed to evade the provisions of the Insurance Code.

When it acts as a management services company, FGI does, in fact, "effectuate" policies, set rates, and collect premiums on behalf of Farmers insuring entities, including FICO. As a practical matter, therefore, FGI may be an entity that "transact[s] insurance" as defined by Or.Rev.Stat. § 731.146(1). The dispositive issue before the Court, however, is whether FGI took an adverse action against Plaintiffs by denying, canceling, increasing in price, or reducing or changing adversely the terms or amounts of insurance based on information in a consumer credit report. The Court, therefore, need not resolve whether FGI has been "transacting insurance" in the State of Oregon without a license as Plaintiffs suggest.

An insurance policy is a contract between an insurer and a policyholder based on the insurer's offer to insure the policyholder on certain terms. During oral argument, Plaintiffs confirmed it was FICO

rather than FGI that extended the offers to insure Plaintiffs:

The Court: So we have an agent, a management company, doing all of the work that matters in terms of the bottom line, but when the solicitation or the renewal goes out to the individuals, doesn't it say, "Farmers Insurance Company of Oregon extends to you this coverage," and you accept by paying the premium to Farmers Insurance Company of Oregon?

Mr. Larson: Yes, it does.

Tr. 30, Hearing on Nov. 22, 2002. In other words, Plaintiffs acknowledged FICO is Plaintiffs' insurer. Indeed, Plaintiffs apparently understood from the beginning that FICO was their insurer because they sent a demand letter to FICO before filing this action that stated: ".... you have charged Mr. Ashby a higher insurance premium due to information contained in his credit report." Ellis Supple. Aff., Ex. A, Letter of 6/29/01. In addition, Plaintiff Ashby admitted he was not insured by FGI and FGI did not issue any insurance policy to him. See Ellis Supple. Aff., Ex. C, Pls.' Resp. to Def.'s First Set of Req. for Admis. Nos. 5–6.

Although Farmers policies may be renewed "each time the Company offers to renew," the policy Declarations in this case identify FICO as "the Company." See Ellis Aff., Ex. I, Porto Policies. The premium notices also identify FICO as the company that is renewing the policy. The notices, moreover, direct the policyholder to make their checks payable to FICO. See Ellis Aff., Ex. I, Porto Policies, and Ex. L, Wenzlick Policies.

FGI acknowledges it "sets premiums for Farmers Group, Inc.'s insuring affiliates." Larson Aff., Ex. 11, Def.'s Resp. to Pls.' Second Set of Interrogs. at 6–7. FGI contends, however, it has never insured any of the named Plaintiffs nor quoted or fixed any of Plaintiffs' premiums. Pflug Aff. at ¶ 6. In any event, the Affidavits and Responses relied on by the parties confirm FGI sets premiums for FICO and not for the policyholder.

Nevertheless, Plaintiffs appear to argue a contractual and financial relationship exists between Plaintiffs and FGI. Plaintiffs point to the existence of subscription agreements in which policyholders designate FGI as AIF. As noted, however, these agreements arise when the Exchanges issue policies, and the Exchanges did not issue the policies in this case. In addition, Plaintiffs contend they pay a percentage of their premiums to FGI for its managerial services. Plaintiffs assert this is evidence of their alleged relationship with FGI. Plaintiffs, however, rely solely on the deposition testimony of two witnesses, both of whom clearly refer only to subscription agreements existing between policyholders of insurance through the Exchanges and FGI or FGI's subsidiaries. See Larson Aff., Ex. 7, Katovich Dep. at 17, 24, and Ex. 8, Wright Dep. at 22–23. In fact, when asked directly, "Are there subscription agreements when a domestic stock company [such as FICO] is involved?" Katovich answered, "No." See Larson Aff., Ex. 7, Katovich Dep. at 48. Moreover, as FGI explained, only FICO pays FGI for its services when FICO is the insuring affiliate, and the payment is calculated as a percentage of the earned premiums. See Larson Aff., Ex. 8, Wright Dep. at 11–13.

In any event, it was established during oral argument that FICO issues the insurance:

Mr. Larson: .... They [FGI] performed an act. They ... used ... [credit] scores when underwriting to price a policy to these plaintiffs and then issued that policy. Those are acts that they are making or performing. And we don't think that the only definition of

take is charging the customer and obtaining the check.

The Court: You say Farmers Insurance Group issued a policy. I didn't understand that from the record. I understood it was Farmers Insurance Company of Oregon that was the insurer.

Mr. Larson: .... What I meant was Farmers Insurance Company of Oregon is the name on the policy, and they may say because their name is on the policy and we pay for the insurance, we issued it. But the entity that actually puts the policy together—together, determines what the terms are, determines what the price is, is Farmers Insurance Group ....

(Tr. 27–28, Hearing on Nov. 22, 2002, at 27–28).

In light of the foregoing, the Court finds as a matter of undisputed fact that FICO was the only entity that contracted with Plaintiffs, issued their policies, acquired the corresponding right to receive their premiums, and maintained the obligation to pay their claims of loss. As the entity that insured Plaintiffs, FICO also was the only entity capable of changing the terms of its insurance contract with Plaintiffs. For example, before FICO could increase the charge for such insurance, FICO had to offer its policyholders the proposed new rate. FGI's use of a rating system to determine the rate to charge was merely a process that preceded FICO taking adverse action by increasing a premium. Accordingly, the Court concludes FGI did not "take" any adverse action as an "insurer" when it made internal decisions and set rates that led to FICO taking its adverse actions against Plaintiffs.

## II. FGI did not "take" any adverse action as AIF/agent for FICO.

 As noted, both parties agree FGI provides its management services to FICO as AIF/agent. According to Plaintiffs, FGI, nevertheless, is directly liable as a "person" who "takes an adverse action" under § 1681m(a).[2] FGI responds it cannot be liable for actions it performed merely as an AIF/agent for FICO.

When agency principles are applied to FCRA, the courts favor application of the general common law of agency rather than the law of any particular state. *See Del Amora v. Metro Ford Sales and Serv., Inc.*, 206 F.Supp.2d 947, 951 (N.D.Ill.2002). *See also Kodrick v. Ferguson*, 54 F.Supp.2d 788, 794 (N.D.Ill.1999)(legislative history of the 1996 amendments to FCRA "indicates that Congress did not intend that we establish differing rules for subscribers based on the agency law in each forum."). Federal courts have adopted the *Restatement of Agency* as the basis for federal common law. *Del Amora v. Metro Ford Sales and Serv., Inc.*, 206 F.Supp.2d at 951.

Under general agency rules, "[u]nless otherwise agreed, a person making or purporting to make a contract with another as agent for a disclosed principal does not become a party to the contract." *Restatement (Second) of Agency* § 320 (1958). At the time a contract is formed, a principal is "disclosed" if the other party to the contract has notice that the agent is acting for a principal and has notice of the principal's identity. *See Restatement (Second) of Agency* § 320 cmt a. If the Court applies these common law agency principles to the issues in this case, therefore, the Court must conclude FGI acted as an agent for a disclosed principal and, as such, FGI would

---

**2.** The parties do not dispute FGI is a "person" as defined by FCRA. "Person" includes "any individual, partnership, corporation, trust, cooperative, association, government or governmental subdivision or agency, or other entity." 15 U.S.C. § 1681a(b).

not be liable for actions it took as FICO's agent.

On the other hand, an agent may be liable for actions taken on behalf of its principal if those actions are in the nature of a tort. "An agent who does an act otherwise a tort is not relieved from liability by the fact that he acted at the command of the principal or on account of the principal, except where he is exercising a privilege of the principal, or a privilege held by him for the protection of the principal's interest, or where the principal owes no duty or less than the normal duty of care to the person harmed." *Restatement (Second) of Agency* § 343.

Before the 1996 amendments to FCRA, courts applied common law agency principles to determine who was a "user" and who was liable for obtaining a report without a permissible purpose as required under § 1681b. *See Yohay v. City of Alexandria Employees Credit Union,* 827 F.2d 967, 973 (4th Cir.1987). For example, in *Mone v. Dranow,* the court reversed a grant of summary judgment in favor of an officer of a corporation for obtaining a credit report for an improper purpose. 945 F.2d 306 (9th Cir.1991). The court rejected the defendant's argument that he was acting in his corporate capacity as chief executive officer when he ordered the credit report because corporate officers are personally liable for their torts under California law and federal common law even if the torts were committed on behalf of the corporation. *Id.* at 308. *But see Allen v. Calvo,* 832 F.Supp. 301, 303 (D.Or. 1993) (court found both the person who requested and the person who received a credit report were "users," but the failure of the person requesting the report to convey the true purpose for the information was not attributable to the person who ultimately received the report).

Since the 1996 amendments to FCRA, courts have applied common law agency principles to find employers vicariously liable when employees obtain credit reports for improper purposes. *See Del Amora v. Metro Ford Sales and Service, Inc.,* 206 F.Supp.2d at 947. *See also Jones v. Federated Fin. Reserve Corp.,* 144 F.3d 961 (6th Cir.1998) (court relied on agency principles when it found a corporate subscriber could be held liable for its employee's personal misappropriation of a confidential consumer report under a theory of apparent authority). *But see Kodrick v. Ferguson,* 54 F.Supp.2d at 788 (agency principles are not applicable and employer subscriber is not vicariously liable when employee obtains a report under false pretenses and for personal use).

The Ninth Circuit has compared in *dicta* a violation of FCRA "disclosure provisions" to an invasion of privacy:

> When a consumer brings an action for violation of the disclosure provisions of the FCRA, the Act's purpose of protecting consumer confidentiality is implicated. In that respect, such cases are akin to invasion of privacy cases under state law-cases where the plaintiff alleges that the defendant unlawfully invaded the plaintiff's privacy by obtaining information deemed confidential.

*Myers v. Bennett Law Offices,* 238 F.3d 1068, 1074 (9th Cir.2001). The Ninth Circuit has not suggested, however, the notice requirements of § 1681m also are "akin" to the tort of invasion of privacy for purposes of holding an agent for a disclosed principal directly liable for the principal's failure to give notice. In any event, the plain meaning of § 1681m(a) requires the "taker" of an adverse action to provide the notice. This Court does not find, nor do the parties provide, any authority to support extending common law agency principles and to find an agent for a disclosed principal violates § 1681m(a) when the principal takes an adverse action and fails to provide the required notice. This

Court, therefore, declines to impose direct liability for a violation of § 1681m(a) to an agent acting on behalf of its disclosed principal.

### III. FGI's use of consumer credit reports as FICO's AIF/agent is insufficient to trigger an independent duty for FGI to give a policyholder notice under FCRA.

Plaintiffs offer three additional arguments to support their contention that FGI has an independent duty to provide notice under § 1681m(a). First, Plaintiffs argue the statutory language "in connection with" as used in the definition of "adverse action" expands the scope of the actions actually listed. Second, Plaintiffs contend a "parallel duty" to give notice arises whenever an authorized user obtains a consumer report for a permissible purpose and an adverse action results. Third, Plaintiffs assert agents are "joint users" with an independent duty to provide notice under § 1681m(a) based on the Federal Trade Commission's Commentary (FTC Commentary) relating to the use of consumer reports by agents.[3]

### A. Statutory language "in connection with"

■ As noted, the definition of "adverse action" in § 1681a(k)(1)(B)(i) includes:

(i) a denial or cancellation of, an increase in any charge for, or a reduction or other adverse or unfavorable change in the terms of coverage or amount of, any insurance, existing or applied for, *in*

*connection with* the underwriting of insurance . . . .

(Emphasis added.) Plaintiffs argue "one need not be an insurer to be liable under FCRA. So long as one engages in activity that is 'in connection with' the underwriting decision that led to the adverse action, potential liability under FCRA arises." The phrase "in connection with," however, modifies the preceding listed actions; i.e., denying, cancelling, increasing, reducing or changing the insurance. When read in context, the phrase does not expand the actions listed. The Court declines to expand the scope of the definition by focusing on the phrase "in connection with" in isolation.

### B. Parallel duty of requesting user

■ During oral argument, Plaintiffs contended a "parallel duty" to give notice arises whenever a person has a permissible purpose for obtaining a consumer credit report in connection with the underwriting of insurance under § 1681b(a)(3)(C).[4] Plaintiffs rely on House Report No. 103–486, which accompanied a 1994 bill that was never enacted. In the House Report, the Committee stated: "[W]henever a person has a permissible purpose to obtain a consumer report on a consumer, it has a parallel duty to furnish an adverse action notice if an adverse action is taken based on information in that report." H.R.Rep. No. 103–486, at 43 (1994). *See also Scharpf v. AIG Mktg, Inc.,* No. CIV. A.3:00–CV–614(H), 2003 WL 215065, at *8 (W.D.Ky. Jan.30, 2003).[5] The Committee

---

**3.** The FTC Commentary constitutes advisory guidelines. 16 C.F.R. pt. 600, App. § 621 at 3; 16 C.F.R. §§ 1.1–1.3. Moreover, FCRA provisions, including § 1681m and the definition of "adverse action," were amended and added in the 1996 legislation after the FTC issued its Commentary.

**4.** Plaintiffs do not argue FGI obtained consumer reports for an impermissible purpose.

**5.** The Court acknowledges Plaintiffs' supplemental citation to *Scharpf v. AIG Mktg, Inc.,*

No. CIV.A.3:00–CV–614(H), 2003 WL 215065 (W.D.Ky. Jan.30, 2003). The Court, however, had already considered this decision which, unfortunately, does not address the primary question in this case, that is, who is the "taker" of adverse action under § 1681m(a).

In *dicta*, the *Scharpf* court indicated defendants used a consumer credit report to take an adverse action without providing any no-

did not indicate whether such a parallel duty would apply if one entity obtained and used a report and a different entity took the adverse action. In any event, Congress did not enact the 1994 bill nor is the language suggesting that a parallel duty exists present in FCRA.

In addition, the plain language of the two statutes, § 1681b and § 1681m, does not support Plaintiffs' interpretation. Section 1681b(a)(3)(C) permits a consumer credit agency to provide a report to a person that apparently "intends to use" the information in connection with the underwriting of insurance involving the particular consumer. Section 1681m(a) requires a person who "takes an adverse action" based on the report to provide the consumer notice. In other words, " '[u]sing' a consumer credit report is distinguished from 'obtaining' and 'procuring' a report." *Kodrick v. Ferguson,* 54 F.Supp.2d at 791 n. 3 (explains the differing duties in § 1681b for persons "obtain[ing]," "procur[ing]," and "tak[ing] any adverse action" when a credit report is used for employment screening).

### C. Joint Users of a consumer report

■ During oral argument, Plaintiffs also contended FGI is independently liable as a "joint user" because § 1681m(a) is not limited by its explicit language to "insurers." Plaintiff relies on the FTC Commentary regarding the ability of agents to obtain a consumer report for a permissible purpose and the "joint user" exception to the definition of consumer reporting agency.

The FTC Commentary permits an agent to obtain a consumer report on behalf of its principal when the agent is involved in making the decision. Specifically, it provides:

> An agent of a party with a "permissible purpose" may obtain a consumer report on behalf of his principal, where he is involved in the decision that gives rise to the permissible purpose. Such involvement may include the agent's making a decision (or taking action) for the principal, or assisting the principal in making the decision (e.g., by evaluating information). In these circumstances, the agent is acting on behalf of the principal. In some cases, the agent and principal are referred to as "joint users."

16 C.F.R. Pt. 600, App. § 604(3)(E)-(6)(2002)(footnote omitted). The FTC notes "agents and principals are bound by the Act." *Id.* at § 604(3)(E)-(6) n. 3.

In addition, the FTC Commentary sets out a "joint user" exception to the definition of "consumer reporting agency." *See* Foster–Throne Letter of 11/20/98 (FTC website<www.ftc.gov>) at 2 n. 1. The FTC Commentary provides:

> Entities that share consumer reports with others that are jointly involved in decisions for which there are permissible purposes to obtain the reports may be 'joint users' rather than consumer reporting agencies
>
> .... An agent or employee that obtains consumer reports does not become a consumer reporting agency by sharing such reports with its principal or em-

tice pursuant to § 1681m(a). Defendants argued notice was not required because the definition of "adverse action" refers only to insurance "existing or applied for" and no formal insurance application had been made. *Id.,* at *8. The court looked to legislative history indicating notice is required when a consumer report is obtained for a permissible purpose and an adverse action is taken. *Id.,*

at *9. The court found the language of "adverse action" does not "precondition an insurance company's taking adverse action on the making of a formal written application." *Id.* The court, however, did not discuss whether the entity providing the binding quote for insurance was the "insurance company" nor who was required to give notice of the adverse action under § 1681m(a).

ployer in connection with the purpose for which the reports were initially obtained.

16 C.F.R. Pt. 600, App. § 603(f)-(8) (2002). Thus, an agent that uses and shares a consumer report is not required to adhere to the FCRA provisions applicable to consumer reporting agencies. The FTC Commentary provisions pertaining to § 615, which correspond to pre-amendment § 1681m, do not refer to an independent duty of "joint users" or agents. *See* 16 C.F.R. Pt. 600, App. § 615 (2002). According to the FTC Commentary, agents are bound by FCRA and may obtain consumer reports for their principals. When doing so, the agents are considered "joint users" rather than consumer reporting agencies.

Based on the foregoing, Plaintiffs ask the Court to find FGI had an independent duty to give notice because FGI "took all of the actions and made all of the determinations that led to the adverse actions being taken." The rules of statutory construction, however, do not permit a court to read such unspecified duties into a statute.

In summary, a person is subject to the notice requirements of § 1681m(a) only if the person "takes" an adverse action. Even though an attorney-in-fact/agent acts on behalf of its disclosed principal by making decisions and setting premiums, the principal as the entity contracting with the policyholder is the only statutory "taker" of adverse action when it increases the policyholder's premium. Here only FICO entered into an insurance contract with Plaintiffs, and only FICO could effect an increase in Plaintiffs' premiums. Although FGI owed certain duties to FICO, FGI's internal decisions that led to FICO's increase of Plaintiffs' premiums do not constitute the taking of adverse action and, therefore, do not trigger the notice requirements under § 1681m(a). The Court, therefore, concludes FGI is entitled to summary judgment as a matter of law.

## CONCLUSION

For these reasons, the Court finds no genuine issues of material fact exist as to whether FGI took adverse action against Plaintiffs, and FGI, therefore, is entitled to summary judgment on Plaintiffs' claims as a matter of law. Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment (# 51). As a result, the Court need not address Plaintiffs' Motion for Class Certification (# 45) and **DENIES** Plaintiffs' Motion **as moot**.

IT IS SO ORDERED.